# EXHIBIT A

Gurbir S. Grewal
ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street; PO Box 093
Trenton, NJ 08625-0093
Tel.: (609) 376-2761
By: Gwen Farley, Deputy Attorney General
Bar No. 000081999
*Attorneys for Plaintiffs*

Leonard Z. Kaufmann
  Atty. ID #045731994
  lzk@njlawfirm.com
COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Tel.: (201) 845-9600
*Special Counsel to the Attorney General*

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; and THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND,<br><br>        Plaintiffs,<br><br>    v.<br><br>E.I. DU PONT DE NEMOURS & COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; and "ABC CORPORATIONS" 1-10 (NAMES FICTITIOUS),<br><br>        Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION<br><br>GLOUCESTER COUNTY<br><br>DOCKET NO.: L-000388-19<br><br>        Civil Action<br><br>**FIRST AMENDED COMPLAINT AND JURY TRIAL DEMAND** |

Plaintiffs New Jersey Department of Environmental Protection

(the "Department" or "NJDEP"), the Commissioner of the New Jersey

Department of Environmental Protection ("Commissioner"), and the

Administrator of the New Jersey Spill Compensation Fund ("Administrator") (collectively, the "Plaintiffs"), file this First Amended Complaint against the above-named defendants (the "Defendants"), and allege as follows:

## STATEMENT OF THE CASE

1.     The Plaintiffs bring this civil action pursuant to the Spill Compensation and Control Act (the "Spill Act"), N.J.S.A. 58:10-23.11 to -23.24;   the Water Pollution Control Act (the "WPCA"), N.J.S.A. 58:10A-1 to -20; the Solid Waste Management Act, N.J.S.A. 13:1E-1, et seq. ("SWMA"); the Department's enabling statute, N.J.S.A. 13:1D-1, et seq.; the Uniform Fraudulent Transfer Act, Del. Code. tit. 6, §§ 1301 to 1312, N.J.S.A. 25:2-20 to 25:2-34; and the common law of New Jersey, for cleanup and removal costs, damages, and other relief as a result of the injury to natural resources of this State that have been, or may be, injured as a result of the discharges of hazardous substances and pollutants at and from the E.I. du Pont de Nemours & Company ("DuPont") Repauno Site, in Gibbstown, Greenwich Township, Gloucester County (the "Repauno Site" or "Site").

2.     Since 1880, Defendants have engaged in the manufacture, storage, and transport of industrial chemicals and high explosive products at the Site, and have generated a diverse and significant amount of hazardous waste, which include, but are not limited to, dimethyl terephthalate heels, aniline heavy waste

oil, aniline tar heels, and waste nitrobenzene mixtures. The Site is comprised of over 1,800 acres, and is surrounded by freshwater wetlands, the Delaware River, Repaupo Creek, and residential neighborhoods. The natural resources at and near the site are damaged by, among other hazardous substances and pollutants, trichloroethylene ("TCE"), nitrobenzene, aniline, diphenylamine, benzene, metals, and polychlorinated biphenyls ("PCBs").

3.     Plaintiffs seek costs and damages for injuries to natural resources of the State, including surface water, groundwater, sediments, wetlands, air, soils, ecological resources, biota, and the public fisc, resulting from Defendants' discharges of hazardous substances and pollutants at and from the Repauno Site.

4.     Such costs and damages include, but are not limited to: the costs of restoring natural resources of the State to their pre-discharge condition; the costs of replacing natural resources; damages for the loss of use and value (including existence value) of natural resources; the costs of assessing natural resource injuries and damages; the unreimbursed costs of investigation, oversight, and remediation; the costs of restoring, repairing, or replacing natural resources damaged or destroyed by a discharge; any income lost from the time the natural resource is damaged to the time it is restored, repaired, or replaced; any reduction in

value of the natural resource caused by the discharge by comparison to its value prior thereto; loss of State tax revenue due to damage to real or personal property proximately resulting from a discharge; the economic benefits Defendants accrued, including any savings realized from avoided capital or noncapital costs for their unpermitted discharges; punitive damages; litigation fees and costs and pre-judgment interest.

5.     This Complaint also seeks to compel the Defendants to fully remediate the Site and off-Site, including efforts to fully delineate and investigate contamination both on-Site and off-Site.

## **THE PARTIES**

6.     The Department is a principal department within the Executive Branch of the State government.  Under the leadership of the Commissioner, it is vested with the authority to conserve natural resources, protect the environment, prevent pollution, and protect the public health and safety.  N.J.S.A. 13:1D-9; N.J.S.A. 58:10-23.11b; N.J.S.A. 58:10A-3.

7.     The State is the trustee, for the benefit of its citizens, of all natural resources within its jurisdiction.  The Department is vested with the authority to protect this public trust and to seek compensation for any injury to the natural resources of this State.  N.J.S.A. 58:10-23.11a.  In addition, the State may act in its parens patriae capacity to protect the State's "quasi-sovereign" interests, including its interest in the health

and well-being of its residents and the integrity of its natural resources. The Department brings this case in its trustee, parens patriae, and regulatory (police power) capacities, as well as in its capacity as an owner of real property directly impacted by contamination originating from the Repauno Site.

8.    Plaintiff Commissioner is the Commissioner of the Department. N.J.S.A. 58:10-23.11b; N.J.S.A. 58:10A-3; and N.J.S.A. 13:1B-2. In this capacity, the Commissioner is vested by law with various powers and authority, including those conferred by the Department's enabling legislation, N.J.S.A. 13:1D-1 to -19; N.J.S.A. 13:1B-3.

9.    Plaintiff Administrator is the Chief Executive Officer of the New Jersey Spill Compensation Fund ("the Spill Fund"). N.J.S.A. 58:10-23.11j. As Chief Executive Officer of the Spill Fund, Plaintiff Administrator is authorized to approve and pay any cleanup and removal costs the Department incurs, N.J.S.A. 58:10-23.11f(c) and (d), and to certify the amount of any claim to be paid from the Spill Fund. N.J.S.A. 58:10-23.11j(d).

10.   Defendant E.I. du Pont de Nemours & Company ("DuPont") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

11.   Defendant The Chemours Company ("Chemours Co.") is a corporation duly organized under the laws of the State of Delaware,

5

with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. In 2015, DuPont spun off its performance chemicals business to Chemours Co., along with certain environmental liabilities.

12.    Defendant The Chemours Company FC, LLC ("Chemours FC") is a limited liability company duly organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, PO Box 2047, Wilmington, Delaware 19899. Chemours FC is a subsidiary of Chemours Co. that was formed in April 2014.

13.    Together, Chemours Co. and Chemours FC are hereinafter referred to as "Chemours."

14.    In October 2013, DuPont announced the separation of several existing business lines into a separate entity, Chemours FC, which began operations as a standalone company on July 1, 2015. Chemours FC assumed the operations, assets, and certain limited liabilities of DuPont's performance chemical business.

15.    Defendants "ABC Corporations" 1-10, these names being fictitious, are entities with identities that cannot be ascertained as of the filing of this Complaint, certain of which are corporate successors to, predecessors of, or are otherwise related to, the identified defendants in this matter, or which are otherwise liable for the causes of action set forth herein.

**NATURAL RESOURCES**

16.    The "natural resources" of this State are all land, fish, shellfish, wildlife, biota, air, water, and other such resources owned, managed, held in trust, or otherwise controlled by the State.  N.J.S.A. 58:10-23.11b.

17.    The natural resources of this State include the "waters of the State," which are the ocean and its estuaries, all springs, streams and bodies of surface water or groundwater, whether natural or artificial, within the boundaries of this State or subject to its jurisdiction.  N.J.S.A. 58:10A-3(t).

18.    New Jersey's habitats and ecosystems — forests, lakes, rivers, wetlands, agricultural lands, coastal estuaries, pinelands, and grasslands — are some of the most threatened in the nation.  They are vulnerable to pollution, degradation, and destruction from the discharge of hazardous substances and pollutants.

19.    Hazardous substances and pollutants have been found in the surface water, groundwater, soils, sediments, wetlands, air, and other natural resources at the Site.

20.    These natural resources have intrinsic (i.e., inherent existence) values.  The current and future residents of New Jersey have a substantial interest in a clean environment.

**Groundwater**

21.    Groundwater — that is, water that exists beneath the Earth's surface — is an extremely important natural resource for

7

the people of New Jersey.   More than half of New Jersey's population obtains drinking water from groundwater sources, and more than 900 million gallons of water per day are used for that purpose.

22.    Private wells, which provide access to groundwater, were widely used in the residential communities around the Repauno Site.  Wells were used for drinking water, watering lawns, and filling swimming pools, among other things.

23.    Not only does groundwater serve as a source of potable water, it also serves as an integral part of the State's ecosystem. Groundwater provides base flow to streams and influences surface water quality, wetland ecological conditions, and the health of the aquatic ecosystem.

24.    Groundwater also provides cycling and nutrient movement within and among the State's bodies of water and wetlands, prevents saltwater intrusion, provides ground stabilization, prevents sinkholes, and helps to maintain critical water levels in freshwater wetlands.

25.    Groundwater and the other natural resources of the State are unique resources that support the State's tourism industry, which helps sustain the State's economy.

26.    Hazardous substances and pollutants discharged at the Site, including but not limited to nitrobenzene, aniline, benzene,

arsenic, and TCE, have reached and adversely impacted the groundwater at the Site.

27.    Groundwater flow beneath the Site in the Upper Aquifer is complicated.

28.    Furthermore, groundwater in the Upper Aquifer moves vertically to recharge streams, process ditches, and wetlands on the Site, and also flows downward to recharge the Middle and Lower Aquifers.  This means that impacted groundwater in the Upper Aquifer either discharges to surface water or migrates to deeper groundwater Aquifers.

### Surface Water

29.    Surface waters are a critical ecological resource of New Jersey.  New Jersey's surface water — which includes all water in the State's lakes, streams, and wetlands — is a primary source of drinking water in the State.  Nearly half of New Jersey's population obtains its drinking water from surface water sources, and approximately 850 million gallons of surface water per day is used for that purpose.

30.    Surface water in New Jersey is also used for other commercial and industrial purposes, such as cooling water and electrical generation, boating, fishing, and transportation of goods and services.

31.    The tourism and recreation industries, which are vital to the State's economy, are dependent on clean water and beaches.

32.     Surface waters also provide commercial, recreational, aesthetic, and ecological value, including by supporting aquatic ecosystems, nearby communities, and the citizens of the State.

33.     The surface waters located at the Site include, but are not limited to the: Delaware River, which abuts the northern boundary of the Site; Repaupo Creek, which is located to the west of the Site; Wiggin's Pond; White Sluice Race, Clonmell Creek and Nehonsey Brook, which run through the Site; and process ditches which discharge into the Sand Ditch Settling Basin, which then discharges into the Delaware River.

34.     Hazardous substances and pollutants discharged at the Site, including but not limited to volatile organic compounds ("VOCs"), ammonia, polycyclic aromatic hydrocarbons ("PAHs"), and metals, have reached and adversely impacted the surface waters at the Site.

### Air

35.     Air resources are vital to life.  Pollution of air resources can injure human health and welfare, flora and fauna, and property, and can unreasonably interfere with the enjoyment of life and property in areas affected by such pollution.  Air deposition (i.e., deposits of air contaminants on the earth's surface) can also be a source of contamination to other types of natural resources, including surface water, groundwater, sediments and soils, wetlands, forests, and biota.

10

36.    Upon  information  and  belief,  air  pollution  from historic activities at the Site have contaminated downwind natural resources.

37.    When  subsurface  air  is  contaminated  with  VOCs,  the subsurface air (i.e., soil gas) can become a source of contaminated air to the structures above, causing vapor intrusion.

### Wetlands

38.    Wetlands  are  a  critical  example  of  New  Jersey's ecological  resources,  which  include  land  and  aquatic  resources comprised of unique and complex ecosystems.

39.    New  Jersey  has  approximately  730,000  acres  of freshwater wetlands, and 250,000 acres of coastal wetlands.

40.    Wetlands  can  sustain  a  wide  diversity  of  plants  and animals that are essential in a healthy food chain, and wetlands perform  many  additional  functions,  which  include  the  improvement of  water  quality,  sediment  trapping,  groundwater  recharge, shoreline  protections,  and  protecting  land  from  flooding  and erosion.

41.    The  Repauno  Site  is  located  in  a  low-lying  marsh region along the Delaware River.

42.    Of  the  1,856  total  acres  that  comprise  the  Repauno Site, approximately 1,087 acres are diverse wetland communities, which  include  riverine  wetlands,  lacustrine  wetlands,  and  various types  of  palustrine  wetlands,  located  on  the  western  and  eastern

11

portions of the Site.  The open water habitats and wetlands contiguous to open water drainage ways account for over 70% of the wetland areas located at the Site.

43.   Hazardous substances and pollutants discharged at the Site, including but not limited to VOCs and metals, have reached and adversely impacted the wetlands at the Site.

### Sediments & Soils

44.   New Jersey's land and aquatic resources are comprised of unique and complex ecosystems.

45.   Sediments and soils are critical components of New Jersey ecological resources.

46.   Sediments and soils can sustain a wide diversity of plants and animals that are essential in a healthy food chain. Sediments are a vital part of the State's ecosystem.  They provide a living substrate for submerged and emergent flora, and support diverse invertebrate species, wading birds, and fish and shellfish populations.

47.   Hazardous substances and pollutants discharged at the Site, including but not limited to VOCs, metals, PAHs, and polychlorinated biphenyls ("PCBs"), have reached and adversely impacted the soils and sediments at the Site.

### Forests

48.   Forests are a critical component of New Jersey's ecological resources.

49.    New Jersey's forests produce clean water and air, absorb runoff, provide recreation, and are home to thousands of species of wildlife.

50.    The Repauno Site contains wooded areas.

51.    Upon information and belief, hazardous substances and pollutants discharged at or released from the Repauno Site have adversely impacted forests both on-Site and off-Site.

### Biota

52.    Biota, including the flora and fauna of the State, are critical ecological resources.  New Jersey is home to more than 2,000 plant species, which include entire communities of rare flora that cannot be found anywhere else in the world. Approximately 15% of the native plant species in New Jersey, however, are now at risk of extinction, with a total of 331 vascular plant species listed as endangered and an additional 32 that have already been extirpated.

53.    New Jersey wildlife includes approximately 900 species, including 90 mammal species, 79 reptile and amphibian species, more than 400 fish species, and approximately 325 species of birds.  Approximately 1.5 million shorebirds and as many as 80,000 raptors make migratory stopovers here each year.

54.    At least 17% of New Jersey's native vertebrate species and 24% of its native invertebrate species are at risk of extinction.  Several threatened and endangered raptor species have

difficulty breeding because of the bioaccumulation of toxic compounds.

55.     New Jersey's biodiversity provides a wealth of ecological, social, and economic goods and services that are an integral part of the ecological infrastructure for all cultural and economic activity in the State.

56.     New Jersey's ecosystems, however, are vulnerable to pollution, degradation, and destruction from the discharge of hazardous substances and pollutants.  Contamination from the discharge of hazardous substances and pollutants is one of the major causes of biodiversity loss.

57.     Natural resource injuries to biota in New Jersey negatively impact not only the individual species directly involved, but the capacity of the injured ecosystems to regenerate and sustain such life into the future.

## GENERAL ALLEGATIONS

58.     The Repauno Site is comprised of 1,856 acres of real property located at 200 North Repauno Avenue, Gibbstown, Greenwich Township, Gloucester County, New Jersey 08027.  This property is also designated and known as Block 8, Lots 1, 2, 3, 4, 4.01, 4.02, 5, and 7.

59.     The Site is bounded by the Delaware River to the north, freshwater wetlands to the West and to the east, Repaupo

Creek to the west, and residential neighborhoods to the south.  In addition, other surface water bodies run throughout the Site.

60.    The Site lies in the recharge area of the Potomac-Raritan-Magothy aquifer system, the major aquifer system used for water supply in Gloucester County.  The general direction of groundwater flow in the aquifer is from the northwest to the southeast.  At some places, the water table is as little as 10-feet below the surface.

### THE REPAUNO SITE HISTORY

61.    Operations began at the Repauno Site in 1880, when DuPont purchased the property from the Repaupo Meadows Corporation, which had operated the Site as a dairy farm.  At that time, DuPont began to manufacture explosives at the Site, producing dynamite, nitroglycerin, diphenylamine, trinitrotoluene ("TNT"), and ammonium nitrate.  Nitric acid and sulfuric acid were produced in support of explosives production, and later became products for sale and shipment.  DuPont's first research laboratory, then used to conduct explosives research, was located on the Repauno Site.

62.    At this same time, a landfill was begun on the Site, located in the northeast corner of the Site, bordered on the north by the Delaware River, and on the south by Clonmell Creek and freshwater wetlands.

63.    During World War I, the Site produced explosives to support the demand for ammunition.

64.     In 1917, DuPont expanded its operations to produce nitrobenzene, aniline, and diphenylamine.  This production took place in the northern section of the site, between A and C-Line Roads.

65.     During World War II, DuPont again expanded its explosives production to manufacture Nitramon®, Amatol, pentaerythritol tetranitrate, trinitrotoluene, hexite, and tetryl. All explosives manufacturing ceased at the Site in 1954.

66.     In 1949, oleum, also known as "fuming sulfuric acid," was produced in the Sulfuric Acid Plant; a byproduct of this was tar oil.

67.     In 1950, DuPont began to manufacture dimethyl terephthalate ("DMT"), which is used in polyester production. DuPont would continue to manufacture DMT until 1973.

68.     In 1951, DuPont sold approximately 42 acres located in the Northwestern portion of the Site to the Atlantic City Electric Company.  Beginning in 1953, this company then supplied steam and electricity from the parcel, called the Greenwich Station.

69.     From 1959 through 1968, an ammonia plant operated at the site in what was called the "Acid Area" of production.  This ammonia was then used to make nitric acid, sodium nitrate, and ammonium nitrate.

70.    In 1960, the Cardox Corporation began leasing six acres of land in the southwest corner of the Site to produce dry ice. This land, and the production thereon, is currently operated by Air Liquide.

71.    In 1965, DuPont ceased the on-site production of anhydrous ammonia. In 1968, a cavern, capable of storing 20,000 tons of ammonia under vacuum and low temperature conditions, was constructed in highly impervious unfractured bedrock located 350-ft. below the surface, designed to store anhydrous ammonia which was shipped from off-Site.

72.    In 1968, DuPont began to manufacture industrial diamonds on the Site. In 1999, this operation was sold to Spring AG, which operated on the property under a ground lease under the name Mypodiamond, Inc. Mypodiamond ceased operations on the property in 2003, and the lease was terminated at that time.

73.    In the 1970s, DuPont began to produce pyromellitic dianhydride ("PMDA"), used in the manufacturing of a high-temperature insulating film, and Nitrosan®, a blowing and foaming agent.

74.    In 1985, DuPont discontinued its production of organic compounds and sulfuric acid.

75.    In 1986, the production of PMDA was discontinued, and Atlantic City Electric Company's Greenwich Station was shut down. In 1990, Atlantic City Electric Company transferred the property

back to DuPont.  DuPont assumed responsibility for cleaning up the parcel formerly occupied by Atlantic City Electric Company.  Later, Chemours FC assumed this responsibility.

76.    In 1998, the manufacturing operation that produced sodium nitrite and nitrosylsulfuric acid ("NSA") was sold to Repauno Products LLC.   Repauno Products LLC discontinued operations in 2007.

77.    In 2015, DuPont sold the Repauno Site to Chemours FC. Chemours FC, by way of a January 30, 2015 Amendment to the Administrative Consent Order (discussed further, infra), accepted responsibility for all remediation of the Site and of any other property containing hazardous substances that emanated from the Site.

78.    On June 30, 2016, Chemours FC sold approximately 125 acres located along the Delaware River in the north-central portion of the Site, to Delaware River Partners, LLC, for redevelopment (hereinafter referenced as the "Redevelopment Area," or "RDA"). The plan for the RDA includes a number of cold storage warehouses, underground storage tanks for butane, which would repurpose the anhydrous ammonia cavern from the original DuPont plant, and an eventual port for importing and exporting goods.  Chemours FC retained all responsibility for the necessary remediation and other activities related to the contamination present on the property sold to Delaware River Partners, LLC.

79.     Presently on the Site, The Cardox Corp. continues to produce dry ice.  All other processes formerly associated with the Site have been discontinued.

### HISTORY OF INVESTIGATION, REGULATION, & REMEDIATION

80.     Groundwater contamination was first discovered in 1984, when benzene, nitrobenzene, chlorobenzene, and perchloroethylene ("PCE") were detected in samples taken from a production well located at the southern boundary of the Site.  A hydrogeological consulting firm determined that within six to 10 years, the plume would migrate to the municipal supply wells of Greenwich Township, if immediate remedial action was not initiated.

81.     In 1985, an intercept well was designed, installed, and tested to contain the groundwater plume.

82.     On December 21, 1989, DuPont entered into an Administrative Consent Order ("ACO") with the Department specifically stating that DuPont was responsible for discharges at the Site in violation of the WPCA and Spill Act.  Pursuant to this ACO, DuPont agreed to conduct remedial investigations and activities to remedy all pollution at the Site, emanating from the Site, or which has emanated from the Site.

83.     Investigations prior to the above ACO revealed 11 Areas of Concern ("AOCs") and 12 Solid Waste Management Units ("SWMUs").

84.    As set forth below, certain SWMUs and AOCs require additional investigation and remediation, and no primary or compensatory restoration work has been performed at the Site.

*Operation & Contamination History at the Site*

85.    Located in the RDA, and bordering the Delaware River, is AOC A, the Acid Area.  This area includes the sodium nitrite area, nitric acid concentration (NAC) area, main wharf, and acid storage tanks.  Running through this area is a wood-lined ditch that once collected and neutralized acidic wastewater runs; a dike or levee is located along the northern side, parallel to the Delaware River.  This area also includes approximately 0.26 acres of palustrine emergent wetlands.  Investigations have found contaminants exceeding various soil thresholds including arsenic and lead, and releases of acids into the groundwater that lowered the pH and mobilized metals.  Overall, the contaminants of concern ("COCs") at AOC A are arsenic, lead, benzene, 2,4-dinitrotoluene ("DNT"), and the pesticide hexachlorocyclohexane ("BHC").

86.    Located in the northern area of the Site, and just south of the RDA, is AOC C, or the former PMDA/DMT Production Area. This AOC is approximately 31 acres, and includes the Methanol and Para-Xylene Tank Farm, located along A-Line Road, and the maintenance shops and buildings north of the manufacturing buildings.  Investigations have found contaminants exceeding various soil thresholds including VOCs, semi-volatile organic

compounds ("SVOCs"), PAHs, and copper.  Additionally, groundwater under AOC C exceeds groundwater quality criteria for organics and metals.  In 2017, some remedial activities had taken place, including soil excavation and off-site disposal.  DuPont has proposed monitored natural attenuation ("MNA"), rather than active cleanup, as its groundwater remedy.

87.    Located in the northern area of the Site, and just west of AOC C, is AOC D, or the former Nitrobenzene Production Area.  Covering approximately 26.6 acres, this area was used to manufacture nitrobenzene, aniline, and diphenylamine ("DPA") between 1916 and 1985.  Investigations have found contaminants exceeding various soil thresholds, including VOCs, PCBs, metals, aniline, arsenic, and DPA.  Additionally, both shallow and deep groundwater under the AOC exceeds groundwater quality criteria for organics and metals.

88.    Located in the eastern portion of the RDA, and bordering the Delaware River, is AOC G, the former Industrial Diamonds Production Area.  Industrial-grade diamonds were manufactured in AOC G for abrasives and other applications.  Prior to this manufacturing, a portion of the area was also used to conduct explosives research.  In addition, a benzene holding tank and truck-loading facility was previously located in the northwest area of AOC G.  Investigations have found contaminants, including PAHs, arsenic, and metals, exceeding various soil thresholds.

Additionally, both shallow and deep groundwater under this AOC exceeds groundwater quality criteria for VOCs, SVOCs, metals, arsenic, and ammonia.

89.     Located inside the RDA is an area known as PCB-Contaminated Soils. This AOC is an area of PCB-contaminated soil that was originally identified as an area within AOC H and subsequently determined to be within the boundary of AOC G, and renamed AOC H-1. This area contains buried concrete from former plant structures. Some remediation of the surface soil has occurred, but subsurface contaminant concentrations have not been delineated.

90.     AOC H, or the Wharf Tank Farm, is also located inside the RDA. This area was a wharf tank farm on land protruding into the Delaware River, where barges and ships unloaded ammonia, sulfuric acid, and potentially petroleum. Historically, there were multiple small spills during its operation that were cleaned up by excavation, neutralization, and washing into the Permitted Plant Ditch system. Investigations have found arsenic exceeding applicable soil thresholds, but subsurface contaminant concentrations have not been delineated. Additionally, groundwater under the AOC exceeds groundwater quality criteria for metals, ammonia, and sulfate.

91.     Located inside the RDA, and to the west of AOC A, is AOC I, the Atlantic City Electric Plant, Greenwich Station. The

facility, which produced steam, electricity, and water for the adjacent Repauno Site, was originally coal-fired but changed to fuel oil in the late 1960s. In February 1986, Greenwich Station was officially shut down; DuPont has assumed responsibility for cleaning up this parcel, and, most recently, Chemours FC has assumed responsibility for cleaning up this parcel. Investigations have found petroleum and other contamination in surface soils, primarily around oil tanks and an oil-water separator. Additionally, groundwater under the AOC exceeds groundwater quality criteria for beryllium, lead, sulfate, chloride, pH, and methylene chloride.

92. Over 1,000 acres of the Repauno Site is classified as wetland habitats, and is collectively denoted as AOC J. To date, remedial investigations within AOC J have only been conducted for wetlands areas considered most likely to have been impacted by the manufacturing operations at the Site, specifically south of AOC D and between A-Line Road and SWMU 10 (discussed further, infra). Soil samples from these areas, specifically south of AOC D, contained elevated concentrations of aniline, DPA, nitrobenzene, copper, lead, nickel, and cadmium. No investigations of contamination have been conducted to date in the vast majority of the AOC J wetlands.

93. Collectively, the on-Site surface water bodies are referred to as AOC K. The primary area of focus is Clonmell Creek,

the easternmost creek at the Site.  The Clonmell Creek watershed historically received on-Site discharges of stormwater runoff and groundwater discharge.  Additionally, the creek runs near the western boundary of the Landfill, SWMU 11 (discussed further, infra).  Investigations have revealed impacts to the surface water and sediments in the Creek by releases of DPA, aniline, and other organics from the adjacent Landfill.  Additionally, an ecological exposure assessment concluded that contaminants in sediments near the landfill were adversely affecting sensitive macroinvertebrate taxa.

94.   Located inside of AOC C is SWMU 3, the Terephthallic Acid ("TPA") Basin.  This SWMU is a four to eight-acre unlined basin formerly used to contain TPA, which was produced between 1950 and 1973 in the DMT manufacturing area.  Investigations revealed TPA contaminations of the soils in this area, which is considered non-hazardous, and VOCs.

95.   Located east of AOC C is SWMU 8, the Iron Oxide Pile. Used as a catalyst in the manufacture of aniline from nitrobenzene, the spent iron oxide was stockpiled from 1959 to 1964 on a 10 to 15-acre area located south of the former Nitrobenzene Production Area in AOC D.  Investigations revealed contamination of the soils by PCBs, arsenic, and copper.

96.   Scattered throughout the Site is the Ditch System, collectively called SWMU 9.  The Ditch System was used to transport

process wastewater, sometimes containing organic constituents, from the manufacturing areas to the Sand Ditch Settling Basin, (discussed further, infra), for treatment before discharge to the Delaware River. Sediments in the Zone-1 Ditches contained elevated organic and inorganic contaminants, and surface water was found to have ethylbenzene, xylenes, ammonia, arsenic, copper, cadmium, and selenium. The Nitrobenzene Production Ditch was found to be contaminated with benzene, nitrobenzene, DPA, aniline, and lead. The sediments in the Process Lab Ditch contained VOCs, SVOCs, and metals. The Zone 2 Ditches contained elevated concentrations of metals in ditch sediments, particularly copper, nickel, and zinc. Ecological evaluations concluded that ditch sediment contaminant concentrations were sufficient to cause adverse effects to sensitive benthic organisms.

97.    Located in the western area of the Site, between the RDA and AOC J, is SWMU 10, the Sand Ditch Settling Basin. Constructed in the late 1700s, the Sand Ditch is the largest open water ditch on-site, encompassing about 49 acres. The Ditch System discharged into the Sand Ditch Settling Basin, which received approximately five to 15 million gallons per day ("mgd") of discharge water in the 1980s and 1990s, compared to an estimated 60 to 80 mgd during DMT manufacturing (primarily before 1973). The primary COCs in surface water at concentrations above water quality criteria include benzene, copper, ammonia, and sulfide.

Copper concentrations in sediment have exceeded ecological screening criteria.

98.     Located in the very easternmost section of the Site and bordering the Delaware River is SWMU 11, the Tar Pits. This SWMU is approximately 20 acres, and consists of a 14-acre, inactive, sanitary landfill; an inactive burning ground; a glass pit; six tar pits; and a waste oil pit. Historically, some materials disposed of in the landfill included aniline, DPA, DMT, scrap metal, building rubble, asbestos, octylated DPA, and xylene. The landfill is separated from the river by a 12-foot-high clay dike that was built in the 1700s. Investigations at this SWMU have revealed soils contaminated with VOCs, metals, PCBs, carbazole, PCE, and TCE. However, groundwater contamination at this SWMU has not been fully investigated or delineated.

99.     Located inside the RDA is SWMU 12, the Fuel Oil Tank. This SWMU was a 2.3-million-gallon steel aboveground storage tank ("AST") that was used to store No. 6 fuel oil from 1919 to 1990. The diked secondary containment area surrounding the AST was used to collect oil and water mixtures. Investigations at this SWMU have revealed soils contaminated with arsenic, copper, zinc, and petroleum hydrocarbons.

100.    Prior to the onset of environmental regulations in the 1970s, companies did not keep track of and report spills. Records of spills and other releases were kept at the Repauno Site

starting in 1976.  Between June 4, 1976, and April 03, 2012, 506 records of incidents related to air, soil, water, and unclassified releases occurred at the Site: 352 incidents correspond to air pollution (mostly nitrogen oxides), 102 incidents were spills to the soil, 43 were spills to the water, and nine were unclassified. Considered in the aggregate, there were regular uncontrolled releases of contaminants at the Site.

101.   The groundwater under nearly the entire Repauno Site has been injured by contaminant releases.

*Classification Exception Area*

102.   When groundwater cannot be used for its normal purpose due to contamination, the Department may require that it be designated a Classification Exception Area ("CEA").  Use of the groundwater is restricted thereby.

103.   In August 2003, a CEA was established, with an average depth of 130 ft.  The CEA covers approximately 940 acres of the Repauno Site, and includes 19 VOCs, ten SVOCs, 16 metals, and one pesticide that have exceeded groundwater quality standards.  The CEA time period is listed as "indeterminate," meaning there is no expectation that groundwater will meet groundwater quality standards at any point in the foreseeable future.

*Regulatory & Remedial History*

104.   Between 1993 and 2005, Remedial Investigations were undertaken at the Site that have been proven to be inadequate

attempts to delineate the extent of the contamination at the Site. In 2003, a Site Ecological Assessment was conducted.

105.     The Site is and has been in the Remedial Action phase, since 2005.  Despite this, all of the AOCs and SWMUs listed above, and others at the Site not described above, require substantial further investigation to fully delineate the extent of remaining contamination and injury to the natural resources both on-Site and off-Site.

106.     Seeking to sell the RDA property to Delaware River Partners, LLC, DuPont placed the remediation of the AOCs affected on a fast track for remediation, and by 2010 was representing to the Department that the remedial investigation and remedial actions for the AOCs were completed.

107.     In 2005, the Department, Administrator, and DuPont entered into a Compensatory Restoration Administrative Consent Order ("CRACO").  The CRACO is not a bar to the claims asserted in this Complaint for reasons including, but not limited to, the following: DuPont has failed to comply with the CRACO, concealed the nature and extent of contamination at its facilities, has attempted to provide contaminated property to fulfill its obligations, additional injuries have been incurred, additional discharges have occurred since the CRACO became effective, and injuries to natural resources, including groundwater, have resulted from remedial action implementation.

108.    Notwithstanding anything to the contrary herein, Plaintiffs are not making a claim regarding contamination in the Delaware River at this time, and are not seeking relief related to the contamination in the Delaware River or its sediments, other than to the extent Plaintiffs seek to have the Defendants pay to investigate and identify contamination emanating from the Site or caused by the Defendants, wherever that contamination may come to rest.

*The Fraudulent Spinoff of DuPont's Specialty Chemicals Business*

109.    DuPont and Chemours have very substantial liabilities due to their polluting activities.  Although perfluorooctanoic acid ("PFOA") and other per- and polyfluoroalkyl substances ("PFAS") contamination are not an issue at the Repauno Site, DuPont's and Chemours' liabilities for PFOA and other PFAS contamination account for a very substantial portion of their environmental liabilities nationwide, and therefore affect their overall ability to satisfy their environmental liabilities for the Repauno Site.

110.    DuPont sought to insulate itself from billions of dollars of legacy pollution liabilities, especially those arising from PFOA and other PFAS contamination at chemical plants that it owned and operated throughout the country.  Upon information and belief, DuPont's potential cumulative liability related to PFOA and other PFAS is likely billions of dollars due to the

persistence, mobility, bio-accumulative properties, and toxicity of these "forever" compounds, as well as DuPont's decades-long attempt to hide the dangers of PFAS from the public.

111.    For more than five decades, DuPont manufactured, produced, or utilized PFOA and other PFAS at plants in New Jersey, West Virginia, and North Carolina.  Throughout this time, DuPont was aware that PFOA was toxic, harmful to animals and humans, bio-accumulative, and bio-persistent in the environment.  DuPont also knew that it had emitted and discharged PFOA in large quantities into the environment, and that tens of thousands of people had been exposed to PFOA, including through public and private drinking water supplies, which DuPont had contaminated.  Thus, DuPont knew, or reasonably should have known, that it faced billions of dollars in liabilities arising from its use of PFOA.

112.    For example, in 1999, members of the Tennant family, owned property impacted by PFOA-contamination adjacent to DuPont's Washington Works plant in Parkersburg, West Virginia, sued DuPont in West Virginia federal court.

113.    DuPont's in-house counsel was very concerned about DuPont's exposure related to PFOA.  In November 2000, one of DuPont's in-house counsel handling PFOA issues wrote to his co-counsel: "We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head.  Getting out in front and acting responsibly can undercut

30

and reduce the potential for punitives . . .  Our story is not a good one, we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical."

114.   In 2005, after confidentially settling the <u>Tennant</u> case, DuPont agreed to pay $10.25 million to resolve eight counts brought by EPA alleging violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act.  That was the largest civil administrative penalty that EPA had ever obtained under a federal environmental statute. DuPont also was required to commit an additional $6.25 million to supplemental environmental projects.  <u>See</u>  <u>https://www.epa.gov/enforcement/reference-news-release-epa-settles-pfoa-case-against-dupont-largest-environmental</u>.

115.   Also, in 2005, DuPont agreed to settle a class action lawsuit, which had been filed on behalf of 70,000 residents of Ohio and West Virginia who had been exposed to PFOA that DuPont had discharged from Washington Works, for $343 million.  Under the terms of the settlement, DuPont agreed to fund a panel of scientists (the "Science Panel") to determine if any diseases were linked to PFOA exposure, to filter local water for as long as PFOA concentrations exceeded regulatory thresholds, and to set aside $235 million for ongoing medical monitoring of the affected

community.   The settlement also provided that any class members who developed the linked diseases would be entitled to sue for personal injury, and DuPont agreed not to contest the fact that exposure to PFOA could cause those diseases.

116.   After eight years, the Science Panel found several human diseases with "probable links" to PFOA exposure, including: high cholesterol; ulcerative colitis; pregnancy-induced hypertension; thyroid disease; testicular cancer; and kidney cancer.

117.   More than 3,500 personal injury claims were filed against DuPont in Ohio and West Virginia as part of the 2005 settlement.   These claims were consolidated in the federal multidistrict litigation styled In Re: E.I. du Pont de Nemours and Company C-8 Personal Injury Litigation (MDL No. 2433) in the United States District Court for the Southern District of Ohio.   Forty "bellwether" trials were scheduled to take place in 2015 and 2016.

118.   DuPont knew that it faced substantial exposure at these trials, as well as liability related to PFOA and other PFAS contamination at other sites throughout the country and that its liability was likely billions of dollars.

119.   In addition to its PFOA and other PFAS liabilities, DuPont was facing very substantial environmental liabilities for its historic manufacturing and research operations throughout the country, including liability for discharges at the Repauno Site.

120.    DuPont sought to limit its environmental liability and protect its assets by engaging in a series of restructuring transactions, including a "spinoff" of its performance chemical business which included Teflon, i.e., one of the primary products that DuPont manufactured using PFOA and which led to widespread contamination throughout the country.

121.    Chemours Co. was incorporated on February 18, 2014 under the name "Performance Operations, LLC." On April 10, 2014, the company was renamed to "The Chemours Company, LLC." On April 30, 2015, the company was converted from a limited liability company to a corporation with the name "The Chemours Company." Prior to July 1, 2015, Chemours Co. was a wholly-owned subsidiary of DuPont.

122.    On July 1, 2015, DuPont completed the spinoff of its performance chemicals business (the "Spinoff") through the creation of Chemours Co., which became a separate, publicly-traded entity.

123.    DuPont and Chemours Co. entered into a June 26, 2015 Separation Agreement to effectuate the Spinoff (the "Separation Agreement"). At the time of the Spinoff, the performance chemicals business consisted of DuPont's Titanium Technologies Chemical Solutions and Flourochemicals segment (collectively, the "Performance Chemicals Business").

124.    Pursuant to the Separation Agreement, DuPont agreed to transfer to Chemours Co. all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants.   Upon information and belief, the Repauno Site was transferred to Chemours Co. via the Separation Agreement and one or more schedules to that Agreement.

125.    Prior to the Spinoff, DuPont completed a significant internal reorganization so that all the assets and liabilities (held by DuPont or its subsidiaries) that DuPont deemed to be part of the Performance Chemicals Business would be held by Chemours Co., as a wholly owned subsidiary of DuPont.

126.    In addition to the assets transferred to Chemours Co., DuPont caused Chemours Co. to assume DuPont's historical liabilities arising from DuPont's discharge of contaminants, including PFOA and other PFAS, into the environment.   While specific details about the liabilities are set forth in non-public schedules that are not available to Plaintiffs, the Separation Agreement required Chemours Co. to assume what the agreement defines as "Chemours Liabilities," which include DuPont's historic liabilities regardless of (i) when or where such liabilities arose, (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the Spinoff, (iii) where or against whom such liabilities are asserted or determined, (iv) whether arising from or alleged to arise from negligence,

gross negligence, recklessness, violation of law, fraud, misrepresentation by DuPont or Chemours Co., and (v) which entity is named in any action associated with any liability.

127.  The Separation Agreement defines Chemours Liabilities broadly, to include "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities. . . .," which include DuPont's historic liabilities relating to and arising from its decades of operations at the Repauno Site and emitting PFOA and PFAS into the environment in New Jersey and elsewhere.

128.  Chemours Co. also agreed to indemnify DuPont in connection with those liabilities that it assumed.  The indemnification has no cap or temporal limitation.

129.  Chemours Co. also agreed to use its best efforts to be fully substituted for DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities . . . ."

130.  Upon information and belief, there was no meaningful negotiation of the Separation Agreement, and DuPont largely dictated its terms.  Indeed, when the Separation Agreement was

signed, Chemours Co. was a wholly-owned subsidiary of DuPont, and a majority of the Chemours Co. board consisted of DuPont employees.

131.    In connection with the Spinoff, Chemours Co. paid DuPont approximately $3.9 billion, consisting of approximately $3.4 billion in cash, plus approximately $507 million in promissory notes.  Chemours Co. also transferred all of its stock to DuPont, which was ultimately delivered to DuPont's shareholders.

132.    Chemours Co. was thinly capitalized following the Spinoff.   Indeed, shortly after the Spinoff, market analysts described Chemours Co. as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

133.    In order to fund the $3.9 billion payment to DuPont, Chemours Co. issued unsecured senior notes and entered into a credit agreement with a syndicate of banks to provide two senior secured credit facilities, incurring a total of $4 billion in indebtedness.  The terms of the financing were dictated by DuPont, in its sole discretion, and not Chemours Co.

134.    According to Chemours Co.'s unaudited pro forma financial statements, as of March 31, 2015 (but giving effect to all of the transactions contemplated in the Spinoff), Chemours Co. had total assets of $6.4 billion and total liabilities of $6.3 billion.  Following the Spinoff, Chemours Co. issued a 10-K stating that, as of December 31, 2015, Chemours Co. had assets totaling $6.3 billion and total liabilities of $6.2 billion.

135.   The 10-K stated that these liabilities included $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation.   The 10-K also stated Chemours Co. had $553 million in "other liabilities," which included $223 million for environmental remediation and $58 million for accrued litigation.

136.   However, Chemours Co. significantly underestimated its liabilities, especially the liabilities that it had assumed from DuPont with respect to PFOA and other PFAS contamination, which DuPont and Chemours Co. should have known would be billions of dollars in addition to other environmental liabilities for other contaminants discharged at DuPont and Chemours facilities.

137.   For example, in 2017, Chemours Co. and DuPont amended the Separation Agreement in connection with the settlement of the personal injury multi-district litigation brought by thousands of residents who had been exposed to PFOA from DuPont's Washington Works plant.   Per the amendment, Chemours Co. paid $320.35 million to the plaintiffs in the settlement on August 21, 2017, and DuPont paid an additional $320.35 million on September 1, 2017.   For all future PFOA costs incurred from July 6, 2017 through July 6, 2022, Chemours Co. agreed to cover the first $25 million per 12-month period, DuPont agreed to cover the next $25 million per 12-month period, and Chemours Co. agreed to cover any additional amounts.

Chemours Co. is a named defendant in numerous lawsuits relating to DuPont's historical use of PFAS.

138.    Had DuPont and Chemours Co. taken the full extent of these liabilities into account, as they should have, Chemours Co. would have negative equity (that is, liabilities that are greater than assets), and would be balance sheet insolvent. Thus, even though PFOA and other PFAS did not contribute to the specific contamination at the Repauno Site, Chemours Co.'s liability for PFOA and other PFAS contamination nationwide (if not world-wide), directly impacts the company's solvency.

## First Count

### (Spill Act)
### (As Against All Defendants)

139.    Plaintiffs repeat each allegation of Paragraphs 1 through 138 above as though fully set forth in its entirety herein.

140.    Each Defendant is a "person" within the meaning of N.J.S.A. 58:10-23.11b.

141.    The discharge of hazardous substances is prohibited. N.J.S.A. 58:10-23.11c.

142.    Many of the COCs at the Site are hazardous substances as defined in N.J.S.A. 58:10-23.11b.

143.    Except as otherwise provided in N.J.S.A. 58:10-23.11g(12), which is not applicable here, any person who discharges

a hazardous substance, or is in any way responsible for any hazardous substance, shall be liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred. N.J.S.A. 58:10-23.11g(c).

144.    The Department and Administrator have incurred, and will continue to incur, costs and damages, including lost use and value, costs of restoration and replacement for natural resources of this State that have been, or may be, injured as a result of discharges at the Repauno Site, and assessment costs.

145.    The costs and damages the Department and Administrator have incurred, and will incur, associated with discharges at the Repauno Site, are "cleanup and removal costs" within the meaning of N.J.S.A. 58:10-23.11b.

146.    The Defendants, as dischargers of hazardous substances at the Repauno Site, are liable, jointly and severally, without regard to fault, for all cleanup and removal costs and damages, including lost use or value and assessment costs, the Department and Administrator have incurred, and will incur, to assess, mitigate, restore, or replace any natural resource of this State that has been, or may be, injured as a result of the discharge of hazardous substances at the Repauno Site. N.J.S.A. 58:10-23.11g(c)(1).

147.    The Defendants, as owners and/or operators of the Repauno Site at the time hazardous substances were discharged

there, also are persons in any way responsible, and are liable, jointly and severally, without regard to fault, for all cleanup and removal costs and damages, including lost use or value and assessment costs, the Department and Administrator have incurred, and will incur, to assess, mitigate, restore, or replace any natural resource of this State that has been, or may be, injured as a result of the discharge of hazardous substances at the Repauno Site.  N.J.S.A. 58:10-23.11g(c)(1).

148.   Pursuant to N.J.S.A. 58:10-23.11u(a)(1)(a) and N.J.S.A. 58:10-23.11u(b), the Department may bring an action in the Superior Court for, inter alia, injunctive relief, N.J.S.A. 58:10-23.11u(b)(1); for its unreimbursed investigation, cleanup and removal costs, including the costs of preparing and successfully litigating the action, N.J.S.A. 58:10-23.11u(b)(2); for natural resource restoration and replacement costs, N.J.S.A. 58:10-23.11u(b)(4); and for any other unreimbursed costs or damages the Department incurs under the Spill Act, N.J.S.A. 58:10-23.11u(b)(5).

149.   Pursuant to N.J.S.A. 58:10-23.11g(a) and (b), the Defendants are also liable for lost income due to damage to natural resources destroyed or damaged by a discharge, and loss of State tax revenue due to damage to real or personal property proximately resulting from a discharge.

150.    As a direct or indirect result of such violations set forth above, the Department and Administrator have incurred, are incurring, and will continue to incur substantial costs including costs relating to:

a.    the investigation, cleanup, and removal of discharged hazardous substances;

b.    the restoration of natural resources contaminated by discharges of hazardous substances at the Repauno Site;

c.    the compensation of the citizens of New Jersey for the lost interim value and benefits of natural resources contaminated by discharges of hazardous substances at the Repauno Site; and

d.    the institution of corrective measures including monitoring of all impacted and potentially impacted public and private drinking water supplies for the presence of hazardous substances, provision of interim water supplies to residents whose water supplies have been contaminated due to such discharges, the establishment of acceptable sources of potable water to injured members of the public, and other necessary remedial actions, all at significant expense, loss, and damage.

151.    The costs and damages the Department and Administrator have incurred, and will incur, are "cleanup and removal costs" within the meaning of N.J.S.A. 58:10-23.11b.

152.    Pursuant to N.J.S.A. 58:10-23.11q, the Administrator is authorized to bring an action in the Superior Court for any unreimbursed costs or damages paid from the Spill Fund.

### PRAYER FOR RELIEF

**WHEREFORE,** the Department and the Administrator request that this Court enter judgment against Defendants as follows:

a.    Ordering each Defendant to reimburse the Department and Administrator, jointly and severally, without regard to fault, for all cleanup and removal costs and direct and indirect damages they have incurred, including lost use and value, costs of restoration and replacement for any natural resource of this State injured as a result of the discharge of hazardous substances at the Repauno Site, with applicable interest, and assessment costs;

b.    Finding each Defendant liable, jointly and severally, without regard to fault, for all future cleanup and removal costs and direct and indirect damages, including lost use and value, costs of restoration and replacement for any natural resource of this State injured as a result of the discharge of hazardous substances at the

Repauno Site, with applicable interest, and assessment costs;

c.    Compelling each Defendant, jointly and severally, without regard to fault, to perform any further cleanup of the Repauno Site and off-Site in conformance with the Site Remediation Reform Act, N.J.S.A. 58:10C-1 to -29, and all other applicable laws and regulations;

d.    Compelling each Defendant, jointly and severally, without regard to fault, to fund the Department's performance of an assessment of any natural resource that has been, or may be, injured as a result of the discharge of hazardous substances at the Repauno Site, and compelling each Defendant to compensate the citizens of New Jersey for the costs of restoration and replacement and lost use and value of any injured natural resource;

e.    Ordering the Defendants to pay for all compensatory damages for the lost interim value of the natural resources at and around the Repauno Site as a result of the contamination of such natural resources by hazardous substances;

f.    Finding each Defendant liable, jointly and severally, without regard to fault, for lost income due to damage to natural resources destroyed or damaged by a

discharge, and loss of State tax revenue due to damage to real or personal property proximately resulting from a discharge;

g.   Awarding the Department and Administrator their costs and fees in this action pursuant to N.J.S.A. 58:10-23.11u(b)(2); and

h.   Awarding the Department and Administrator interest and such other relief as this Court deems appropriate.

## Second Count

### (Water Pollution Control Act)
### (As Against All Defendants)

153.   Plaintiffs repeat each allegation of Paragraphs 1 through 152 above as though fully set forth in its entirety herein.

154.   Defendants are each a "person" within the meaning of N.J.S.A. 58:10A-3.

155.   Except as otherwise exempted pursuant to N.J.S.A. 58:10A-6(d) and (p), which are not applicable here, it is unlawful for any person to discharge any pollutant except to the extent the discharge conforms with a valid New Jersey Pollutant Discharge Elimination System permit issued by the Commissioner pursuant to the WPCA, or pursuant to a valid National Pollutant Discharge Elimination System permit issued pursuant to the federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to -1387.   N.J.S.A. 58:10A-6(a).

156.   The unauthorized discharge of pollutants is a violation of the WPCA for which any person who is the discharger is strictly liable, without regard to fault.   N.J.S.A. 58:10A-6(a).

157.   The Department has incurred, or will continue to incur, costs as a result of the discharge of pollutants at the Repauno Site.

158.   The Department also has incurred, and will continue to incur, costs and damages, including the costs of investigation to establish a violation at the Repauno Site, costs in removing, correcting, or terminating the adverse effects upon water quality or public health due to violations at the Repauno Site, and compensatory damages and any other actual damages for any natural resource of this State that has been, or may be, lost or destroyed as a result of the discharge of pollutants at the Repauno Site.

159.   The Defendants discharged pollutants at the Repauno Site, which discharges were neither permitted pursuant to N.J.S.A. 58:10A-6(a), nor exempted pursuant to N.J.S.A. 58:10A-6(d) or N.J.S.A. 58:10A-6(p), and are liable, without regard to fault, for all costs and damages, including compensatory damages and any other actual damages for any natural resource of this State that has been, or may be, lost or destroyed as a result of the discharge of pollutants at the Repauno Site.

160.    The costs and damages the Department has incurred, and will incur, for the Repauno Site are recoverable within the meaning of N.J.S.A. 58:10A-10(c)(2)-(4).

161.    Pursuant to N.J.S.A. 58:10A-10(c), the Commissioner may bring an action in the Superior Court for injunctive relief, N.J.S.A. 58:10A-10(c)(1); for the costs of any investigation, inspection, or monitoring survey which led to establishment of the violation, including the costs of preparing and litigating the case, N.J.S.A. 58:10A-10(c)(2); any cost incurred by the State in removing, correcting, or terminating the adverse effects upon water quality resulting from any unauthorized discharge of pollutants for which action under this subsection may have been brought, N.J.S.A. 58:10A-10(c)(3); compensatory damages and any other actual damages for any natural resource of this State that has been, or may be, lost or destroyed as a result of the unauthorized discharge of pollutants, N.J.S.A. 58:10A-10(c)(4); and the actual amount of any economic benefits accruing to the violator from any violation, including savings realized from avoided capital or noncapital costs resulting from the violation, the return earned or that may be earned on the amount of avoided costs, any benefits accruing as a result of a competitive market advantage enjoyed by reason of the violation, or any other benefit resulting from the violation, N.J.S.A. 58:10A-10(c)(5).

## PRAYER FOR RELIEF

**WHEREFORE,** the Commissioner requests that this Court enter an order granting judgment against the Defendants, jointly and severally, and without regard to fault:

    a.    Permanently enjoining the Defendants, requiring them to remove, correct, or terminate the adverse effects on water quality resulting from any unauthorized discharge of pollutants at or from the Repauno Site;

    b.    Ordering the Defendants, without regard to fault, to pay for the costs for any investigation, inspection, or monitoring survey, leading to establishment of the violation, including the costs of preparing and litigating the case;

    c.    Finding the Defendants liable, without regard to fault, for all costs for removing, correcting, or terminating the adverse effects upon water quality resulting from any unauthorized discharge of pollutants at the Repauno Site;

    d.    Finding the Defendants liable, without regard to fault, for all compensatory damages and other actual damages for any natural resource of the State that has been, or may be, injured, lost, or destroyed as a result of the unauthorized discharge of pollutants at the Repauno Site;

e.    Finding the Defendants liable, without regard to fault, the for amount of any economic benefits they have accrued, including any savings realized from avoided capital or noncapital costs, the return they have earned of the amount of avoided costs, and benefits each Defendant has enjoyed as a result of a competitive market advantage, or any other benefit they have received as a result of having violated the WPCA;

f.    Awarding the Commissioner her costs and fees in this action pursuant to N.J.S.A. 58:10A-49.1(c)(2); and

g.    Awarding the Commissioner interest and such other relief as the Court deems appropriate.


### Third Count

### Solid Waste Management Act
### (As Against All Defendants)

162. Plaintiffs repeat each allegation of Paragraphs 1 through 161 above as though fully set forth in its entirety herein.

163. The Defendants are each a "person" within the meaning of N.J.S.A. 13:1E-3.

164. The Solid Waste Management Act ("SWMA" or the "Act") defines "[s]olid waste" as, _inter alia_, "discarded materials resulting from industrial, commercial and agricultural operations" and "all other waste materials." N.J.S.A. 13:1E-3.  N.J.A.C. 7:26-

1.6(b) defines "other waste material," in pertinent part, as "any solid, liquid, semi-solid or contained gaseous material, including, but not limited to spent material, sludge, by-product, discarded commercial chemical products, or scrap metal resulting from industrial, commercial, mining or agricultural operations, from community activities, or any other material which has served or can no longer serve its original intended use, which . . . [i]s discarded or intended to be discarded . . . [i]s applied to the land or placed on the land or contained in a product that is applied to or placed on the land in a manner constituting disposal." N.J.A.C. 7:26-1.6(b) provides that "a material is also a solid waste if it is 'disposed of' by being discharged, deposited, injected, dumped, spilled, leaked or placed into or on any land or water so that such material or any constituent thereof may enter the environment or be emitted into the air or discharged into ground or surface waters."

165. N.J.S.A. 13:1E-3 of the SWMA and N.J.A.C. 7:26-1.4 define "disposal" as "the storage, treatment, utilization, processing, resource recovery of, or the discharge, deposit, injection, dumping, spilling, leaking or placing of any solid or hazardous waste into or on any land or water, so that the solid or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including groundwaters."

166. Various constituents present in soils, groundwater and surface water in and around the Site are discarded materials and are "solid waste" as defined under N.J.S.A. 13:1E-3 and N.J.A.C. 7:26-1.6.

167. The Defendants have engaged in the past disposal, and/or are continuing to engage in the disposal, of solid waste in and around the Site in the form of various constituents without first having filed a completed application for and received approval of a solid waste facility ("SWF") permit for such activities, resulting in the widespread presence of such solid wastes in soils, groundwater, and surface water in and around the Site, all in violation of N.J.A.C. 7:26-2.8(e).

168. The Defendants have engaged in the past disposal, and/or are continuing to engage in the disposal, of solid waste in and/or around the Site in the form of hazardous constituents in excess of 0.148 cubic yards of solids and/or 30 gallons of liquids, at locations other than a permitted SWF, resulting in the widespread presence of such solid wastes in soils, groundwater and surface water in and around the Site, in violation of N.J.S.A. 13:1E-9.3.

169. Pursuant to N.J.S.A. 13:1E-9(b) and (d), when the Commissioner finds that a person has violated any provision of the SWMA or any regulations adopted pursuant to the SWMA, the Commissioner is authorized to bring a civil action in Superior Court seeking temporary or permanent injunctive and other relief,

as well as assessment of the violator for the costs of any
investigation leading to the establishment of the violation, costs
incurred by the State in removing, correcting or terminating the
adverse effects to water and air quality resulting from the
violation, and assessment against the violator of compensatory
damages for any loss or destruction of wildlife, fish or aquatic
life, and for any other actual damages, all of which relief may be
awarded in a summary manner.

### **PRAYER FOR RELIEF**

WHEREFORE, the Commissioner requests that this Court enter
judgment against the Defendants as follows:

   a.   Ordering Defendants to, jointly and severally, fully
        comply with the SWMA by, _inter alia_, removing all
        unlawfully disposed of solid waste from all locations in
        and around the Site at which the same have come to be
        located and for which Defendants did not obtain a SWF
        permit;

   b.   Ordering Defendants, jointly and severally, to reimburse
        the Commissioner for the reasonable costs of preparing
        and litigating her claim seeking the enforcement of
        Defendants' obligations pursuant to the SWMA;

   c.   Ordering Defendants, jointly and severally, to reimburse
        the Commissioner for the cost incurred by the Department
        in removing, correcting, or terminating the adverse

effects upon water and air quality resulting from their violations of the SWMA;

d.   Ordering Defendants, jointly and severally, to compensate the State of New Jersey for the loss or destruction of wildlife, fish or aquatic life, and other actual damages caused by their violations of the SWMA; and

e.   Awarding the Commissioner such other relief as this Court deems appropriate.

## **Fourth Count**

### **(Public Nuisance)**
### **(As Against All Defendants)**

170.   Plaintiffs repeat each allegation of Paragraphs 1 through 169 above as though fully set forth in its entirety herein.

171.   Groundwater, surface water, sediments, wetlands, soils, and biota are natural resources of the State held in trust by the State.

172.   The use, enjoyment, and existence of uncontaminated natural resources is a right common to the general public.

173.   The contamination of the groundwater, surface water, sediment, wetlands, soils, and biota at and around the Repauno Site constitutes a physical invasion of the State's natural resources, and upon information and belief, the State's real property in the vicinity of the Repauno Site, and an unreasonable

and substantial interference, both actual and potential, with (1) the exercise of the public's common right to these natural resources; (2) the State's special property and statutory status and obligations regarding the natural resources of the State; (3) the State's ability, through the Department, to protect, conserve and manage the natural resources of the State, which are by law precious and invaluable public resources held by the State in trust for the benefit of the public; and (4) the rights of the people of the State to enjoy their natural resources free from interference by pollution and contamination.

174.    Upon information and belief, real property owned by the State has become contaminated by the Repauno Site, and therefore, the Department has suffered a special injury different from that common to the general public.

175.    As long as these natural resources at and around the Repauno Site remain contaminated due to the Defendants' conduct, the public nuisance continues.

176.    Until these natural resources are restored to their pre-injury quality, the Defendants are liable for the creation, and continued maintenance, of a public nuisance in contravention of the public's common right to clean natural resources.

177.    The acts of the Defendants as set forth above were willful and wanton.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiffs request that this Court enter judgment against the Defendants as follows:

a.  Ordering the Defendants to reimburse the Department and Administrator for their costs of abatement, without regard to fault, including but not limited to all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the State's natural resources so that such natural resources are restored to their original condition;

b.  Compelling the Defendants to abate the nuisance by investigating, cleaning up, restoring, treating, monitoring, and otherwise responding to contamination in the State's natural resources so that such natural resources are restored to their original condition;

c.  Compelling the Defendants to pay special damages to Plaintiffs, funding the Department's performance of any further assessment and compensatory restoration of any natural resource that has been, or may be, injured as a result of the discharge of hazardous substances and pollutants at the Repauno Site, and compelling the Defendants to compensate the citizens of New Jersey, for the costs of restoration and replacement, including lost use and value of any injured natural resource;

d.   Ordering the Defendants to pay for all compensatory damages for the lost interim value of the natural resources at and around the Repauno Site as a result of the contamination of such natural resources by pollutants and hazardous substances;

e.   Awarding Plaintiffs punitive damages in an amount to be determined by the Court;

f.   Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

g.   Awarding Plaintiffs such other relief as this Court deems proper.

## **Fifth Count**

### **(Trespass)**
### **(As Against All Defendants)**

178.   Plaintiffs repeat each allegation of Paragraphs 1 through 177 above as though fully set forth in its entirety herein.

179.   Groundwater, surface water, sediment, wetlands, soils, and biota are natural resources of the State held in trust by the State for the benefit of the public. Water resources are owned by the State for the benefit of its citizens.

180.   The State brings this claim in both its public trustee and parens patriae capacities.

181.   As the trustee over the State's natural resources, the State has a duty to protect and restore all natural resources of the State and protect the health and comfort of its inhabitants.

182.   In its parens patriae capacity, the State may protect its "quasi-sovereign" interests, including the State's interest in the well-being of its populace, as well as the populace's interest in the integrity of the State's natural resources. Accordingly, the State is bringing this action for the invasion of its residents' possessory interests in the State's natural resources, because the harm to such interests is too widespread for any individual residents to seek relief themselves. Waters, sediments, and biota that have been affected by the Defendants' contamination are mobile, moving to and inhabiting areas far from the immediate area of the initial contamination.

183.   Additionally, the State is the owner of lands in the vicinity of the Repauno Site.

184.   The hazardous substances and pollutants in the groundwater, surface water, sediment, wetlands, soils, and biota at and around the Repauno Site, including on State-owned lands, constitute a physical invasion of property without permission or license, as well as further removed from the Repauno Site.

185.   The Defendants are liable for trespass, and continued trespass, because the hazardous substances and pollutants in the groundwater, surface water, sediment, wetlands, soils, and biota

at and around the Repauno Site, as well as contamination previously removed from the Repauno Site, resulted from discharges of hazardous substances and pollutants at the Repauno Site.

186.   As long as the natural resources remain contaminated due to the Defendants' conduct, the trespass continues.

187.   The acts of the Defendants as set forth above were willful and wanton.

### **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs request that this Court enter judgment against the Defendants as follows:

a.   Finding the Defendants liable, jointly and severally, for all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the State's natural resources so that such natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of their natural resources during all times of injury caused by hazardous substances and pollutants, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

i.   Past and future testing of natural resources likely to have been contaminated by hazardous substances or pollutants;

    ii.   Past and future treatment of all natural resources containing detectable levels of hazardous substances or pollutants restored to non-detectable levels; and

    iii. Past and future monitoring of the State's natural resources to detect the presence of hazardous substances or pollutants, and restoration of such natural resources to their pre-discharge condition;

b.   Ordering the Defendants to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of contamination of the State's natural resources;

c.   Ordering the Defendants to pay for all damages in an amount at least equal to the full cost of restoring the State's natural resources to their original condition prior to the contamination;

d.   Ordering the Defendants to pay for all compensatory damages for the lost value (including lost use) of the State's natural resources as a result of the contamination of such natural resources;

e.   Ordering the Defendants to pay for all other damages sustained by Plaintiffs in their public trustee, <u>parens patriae</u>, and regulatory capacities as a direct and

proximate result of the Defendants' acts and omissions alleged herein;

f.   Entering an order against the Defendants for all appropriate injunctive relief to abate or mitigate the contamination that the Defendants caused;

g.   Awarding Plaintiffs punitive damages in an amount to be determined by the Court;

h.   Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.   Awarding Plaintiffs such other relief as this Court deems appropriate.

### Sixth Count

**(Negligence)**
**(As Against All Defendants)**

188.   Plaintiffs repeat each allegation of Paragraphs 1 through 187 above as though fully set forth in its entirety herein.

189.   The Defendants had a duty to Plaintiffs to ensure that hazardous substances and pollutants were not discharged at the Repauno Site and did not injure groundwater, surface water, sediment, wetlands, soils, and biota at and around the Repauno Site.

190.   The Defendants breached these duties.

191.    As a direct and proximate result of the Defendants' discharges of hazardous substances and pollutants at the Repauno Site, groundwater, surface water, sediment, wetlands, soils, and biota at and around the site have been injured.  The Defendants are jointly and severally liable for such injuries and the consequential damages.

192.    As a further direct and proximate result of the Defendants' discharge of hazardous substances and pollutants at the Repauno Site, the Department and Administrator have incurred, are incurring, and will continue to incur investigation, cleanup and removal, treatment, monitoring and restoration costs, and expenses for which the Defendants are jointly and severally liable.

193.    The acts of the Defendants as set forth above were willful and wanton.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs request that this Court enter judgment against the Defendants as follows:

a.    Finding the Defendants liable, jointly and severally, for all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination in the State's groundwater, surface waters, and other natural resources so that such natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use

and value of their natural resources during all times of injury caused contamination, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

    i.   Past and future testing of groundwater, surface waters, and natural resources likely to have been contaminated by pollutants and hazardous substances;

    ii.   Past and future treatment of all groundwater, surface waters, and other natural resources containing detectable levels of pollutants and hazardous substances until restored to non-detectable levels; and

    iii. Past and future monitoring of the State's groundwater, surface waters, and other natural resources to detect the presence of pollutants and hazardous substances, and restoration of such natural resources to their pre-discharge condition;

b.   Assessing the Defendants for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of contamination of the State's groundwater, surface waters, and other natural resources;

c.  Assessing the Defendants for all damages in an amount at least equal to the full cost of restoring the State's groundwater, surface waters, and other natural resources to their original condition prior to the contamination of such natural resources;

d.  Assessing the Defendants for all compensatory damages for the lost value (including lost use) of the State's groundwater, surface waters, and other natural resources as a result of the contamination of such natural resources;

e.  Assessing the Defendants for all other damages sustained by Plaintiffs as a direct and proximate result of the Defendants' acts and omissions alleged herein, including remedial, administrative, oversight, and legal fees and expenses;

f.  Entering an order against the Defendants for all appropriate injunctive relief to abate or mitigate the contamination that Defendants caused;

g.  Awarding Plaintiffs punitive damages in an amount to be determined by the Court;

h.  Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.  Awarding Plaintiffs such other relief as this Court deems appropriate.

**Seventh Count**

**(Actual Fraudulent Transfer)**
**(As Against DuPont and Chemours Co.)**

194.  Plaintiffs repeat each allegation of Paragraphs 1 through 193 above as though fully set forth in its entirety herein.

195.  Plaintiffs are and were creditors of Chemours Co. at all relevant times.

196.  Through its participation in the Spinoff, as detailed above, Chemours Co. transferred valuable assets to DuPont, including the $3.9 billion dividend (the "Transfers"), while simultaneously assuming significant liabilities pursuant to the Separation Agreement (the "Assumed Liabilities").

197.  The Transfers and Assumed Liabilities were made for the benefit of DuPont.

198.  At the time that the Transfers were made and the Assumed Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours Co.

199.  Chemours Co. made the Transfers and incurred the Assumed Liabilities with the actual intent to hinder, delay and defraud the creditors or future creditors of Chemours Co.

200.    Plaintiffs have been harmed as a result of the Transfers.

201.    Under Del. Code. Tit. 6 Sec. 1301 to 1312 and N.J.S.A. 25:2-20 to 25:2-34, Plaintiffs are entitled to void the Transfers and to recover property or value transferred to DuPont.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court enter judgment against DuPont and Chemours Co. as follows:

a.   Voiding the Transfers to the extent necessary to satisfy the Plaintiffs' claims;

b.   Awarding Plaintiffs prejudgment interest and attorneys' fees and costs; and

c.   Awarding Plaintiffs such other relief as this Court deems appropriate.

### Eighth Count
**(Constructive Fraudulent Transfer)**
**(As Against DuPont and Chemours Co.)**

202.    Plaintiffs repeat each allegation of Paragraphs 1 through 201 above as though fully set forth in its entirety herein.

203.    Plaintiffs are and were creditors of Chemours Co. at all relevant times.

204.    Chemours Co. did not receive reasonably equivalent value from DuPont in exchange for the Transfers and Assumed Liabilities.

205.   Each of the Transfers and Chemours Co.'s assumption of the Assumed Liabilities was made to or for the benefit of DuPont.

206.   At the time that the Transfers were made and the Assumed Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours Co.

207.   Chemours Co. made the Transfers and assumed the Assumed Liabilities when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

208.   Chemours Co. was insolvent at the time or became insolvent as a result of the Transfers and its assumption of the Assumed Liabilities.

209.   At the time that the Transfers were made and Chemours Co. assumed the Assumed Liabilities, DuPont and Chemours Co. intended Chemours Co. to incur, or believed, or reasonably should have believed that Chemours Co. would incur debts beyond its ability to pay as they became due.

210.   Plaintiffs have been harmed as a result of the Transfers.

211.   Under Del. Code. Tit. 6 Sec. 1301 to 1312 and N.J.S.A. 25:2-20 to 25:2-34, Plaintiffs are entitled to void the Transfers and to recover property or value transferred to DuPont.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court enter judgment against DuPont and Chemours Co. as follows:

    a.    Voiding the Transfers to the extent necessary to satisfy the Plaintiffs' claims;

    b.    Awarding Plaintiffs prejudgment interest and attorneys' fees and costs; and

    c.    Awarding Plaintiffs such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiffs are entitled to a jury trial and hereby demand a trial by jury.

## RULE 4:5-1 CERTIFICATION

I hereby certify that, to the best of my knowledge and belief, the matter in controversy is not the subject of any action pending in any other court or of a pending arbitration proceeding, nor is any other action or arbitration proceeding contemplated, except as follows: NJDEP, et al. v. E.I. du Pont de Nemours & Company, et al., MID-L-002448-19 (relating to the DuPont/Chemours Parlin site); NJDEP, et al. v. E.I. du Pont de Nemours & Company, et al., SLM-L-000057-19 (relating to the DuPont/Chemours Chambers Works site); NJDEP, et al. v. E.I. du Pont de Nemours & Company, et al., PAS-L-000936-19 (relating to the DuPont/Chemours Pompton Lakes site). I know of no other parties other than the parties set forth

in this pleading who should be joined in the above action.  I recognize the continuing obligation of each party to file with the Court and serve on all parties an amended Certification if there is a change in the facts stated in the original Certification.

<u>**DESIGNATION OF TRIAL COUNSEL**</u>

Pursuant to <u>Rule</u> 4:25-4, Plaintiffs designate Leonard Z. Kaufmann, Esq., as trial counsel in this matter.

Dated: May 31, 2019

**Gurbir S. Grewal**
**ATTORNEY GENERAL OF NEW JERSEY**
*Attorneys for Plaintiffs*

By: */s/ Gwen Farley*
Gwen Farley
Deputy Attorney General
  (Atty. ID #000081999)
Richard J. Hughes Justice Complex
25 Market Street; PO Box 093
Trenton, New Jersey 08625-0093
Tel.: (609) 376-2761

**COHN LIFLAND PEARLMAN**
  **HERRMANN & KNOPF LLP**
Special Counsel to the Attorney General

By: */s/ Leonard Z. Kaufmann*
Leonard Z. Kaufmann
  (Atty. ID #045731994)
A Member of the Firm
Also by:  Joseph A. Maurice
          Christina N. Stripp
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Tel.: (201) 845-9600

**KELLEY DRYE & WARREN LLP**
Special Counsel to the Attorney General
By:    William J. Jackson
       John Gilmour
       David Reap
       Melissa E. Byroade
515 Post Oak Blvd. Suite 900
Houston, Texas 77027
Tel.: (713) 355-5000

**LAW OFFICES OF JOHN K. DEMA, P.C.**
Special Counsel to the Attorney General
By:    John K. Dema
       Scott E. Kauff
       John T. Dema
       James Crooks
1236 Strand Street, Suite 103
Christiansted, St. Croix
U.S. Virgin Islands 00820-5034
Tel.: (340) 773-6142