Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, et al.<br><br>*Plaintiffs*,<br><br>v.<br><br>E.I. DU PONT DE NEMOURS AND COMPANY, et al.<br><br>*Defendants*. | Civil Action Nos.<br>19-14758,<br>19-14765,<br>19-14766,<br>19-14767.<br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

This matter involves four cases which have been consolidated before the Court for pretrial proceedings. Currently pending is a partial motion to dismiss Count III of Plaintiffs' Second Amended Complaint filed in one of the cases (Civ. No. 19-14766) arising out of Defendants' alleged environmental contamination of four sites in New Jersey. Count III is a claim under New Jersey's Industrial Site Recovery Act ("ISRA"), N.J. Stat. Ann. § 13:1K-6 to -14. Movants are Defendants E.I. du Pont de Nemours and Company ("Old DuPont"); Corteva, Inc. ("Corteva"); and DuPont de Nemours, Inc. ("New DuPont"). The Court reviewed all submissions in support

and in opposition of the motion,[1] and considered the motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1(b).  For the reasons that follow, Movants' motion is **denied**.  In large part, Movants ask the Court to consider information not appropriate at this stage; ask the Court to consider other information, the legal effect of which is not clear; and ask the Court to engage in analyses that are not appropriate at this stage.

## I.      FACTS AND PROCEDURAL HISTORY

These consolidated cases arise out of Old DuPont's alleged contamination of four different sites in New Jersey, which Plaintiffs refer to as (1) the Chambers Works Site (Civ. No. 19-14766); (2) the Parlin Site (Civ. No. 19-14767); (3) the Pompton Lakes Works Site (Civ. No. 19-14758); and (4) the Repauno Site (Civ. No. 19-14765).  Only the Chambers Works Site is implicated in this motion.  M. Br. at 5 n.1.  The factual predicate of this litigation has been summarized and discussed by the Court on several occasions.  *E.g.*, D.E. 195; D.E. 197.[2]  The Court incorporates by reference those recitations and adds the following background relevant to the instant motion.

Plaintiffs allege that Old DuPont discharged dangerous chemicals at the Chambers Works Site for 125 years.  Civ. No. 19-14766 D.E. 57 ("SAC") ¶ 2.  Those chemicals include "per- and polyfluoroalkyl substances ('PFAS')."  *Id.*  PFAS are problematic because they do not naturally degrade, lasting forever if released into the environment.  *Id.* ¶ 4.  They can be dispersed through the air and water.  *Id.* ¶ 6.  If a person is exposed to PFAS, those chemicals can enter the bloodstream and accumulate, posing a great health risk.  *Id.* ¶ 4.  Old DuPont emitted PFAS in

---

[1] Movants' brief in support of the instant motion, D.E. 174-1 will be referred to as "M. Br."; Plaintiffs' brief in opposition, D.E. 200, will be referred to as "Opp'n"; Movants' reply to Plaintiffs' opposition, D.E. 118, will be referred to as "M. Reply".

[2] Unless otherwise indicated, the "D.E." citations in this Opinion are associated with Civ. No. 19-14758.

large quantities for over half a century while knowing of their danger and concealing their dangerous propensities from the public and regulators. *Id.* For about the last twenty years, Old Dupont has been facing lawsuits across the country for the harm caused by its pollution. *See id.* ¶ 202 (describing 1999 federal litigation in West Virginia).

Plaintiffs accuse Defendants of engaging in a complex series of corporate transactions to limit their liability and shield their assets. *Id.* ¶ 11. Old DuPont created a subsidiary company, the Chemours Company ("Chemours")—a party to this litigation but not to this motion—in 2014. *Id.* ¶ 224. Old DuPont transferred the Chambers Works Site to Chemours's subsidiary, Chemours FC, LLC, another party to this litigation but not this motion, in 2015. *Id.* ¶¶ 20, 68, 70. Later that year, Chemours separated from Old DuPont and became an independent, publicly traded company. *Id.* ¶ 226. As part of the separation, Chemours assumed Old DuPont's liability for discharging PFAS and contaminating the environment in exchange for approximately $4.1 billion. *Id.* ¶¶ 235-43. Plaintiffs allege that Old DuPont dictated the terms of the transaction and that the details as to the nature of the probable loss, the amount of the probable loss, and the timing of the liabilities are hidden in confidential schedules. *Id.* ¶¶ 235, 245. In a filing in a Delaware state court, Chemours represented that if it follows its obligations in the separation agreement, Chemours would have been insolvent when Old DuPont spun it off. *Id.* ¶ 244; *see also id.* ¶ 256. Old DuPont thereafter represented to the public that it foisted all liability for PFAS onto Chemours. *Id.* ¶ 256. At some point, Chemours FC leased a portion of the Chambers Works Site back to Old DuPont. *Id.* ¶ 69. Plaintiffs refer to the leasehold as "the 'Tenant Space[.]'" Opp'n at 2.

Plaintiffs represent that Old DuPont knew that it still faced liability, including the possible punitive damages, for its PFAS pollution. *Id.* ¶ 258. Old DuPont and the Dow Chemical Company

("Old Dow") then merged to form New DuPont[3] in December 2015.  *Id.* ¶¶ 259-60.  Old DuPont is now a subsidiary of New DuPont, whose shareholders are comprised of the holders of Old Dow and Old DuPont.  *Id.* ¶¶ 261, 263.  Plaintiffs, however, allege that the "merger" was only one in name because Old Dow would have taken on Old DuPont's PFAS liability if the companies had actually merged.  *Id.* ¶ 262.  Rather, Plaintiffs explain that Old Dow and Old DuPont are now "affiliated sister companies" owned by New DuPont.  *Id.*

New DuPont, Old DuPont, and Old Dow then engaged in further reorganizations.  *Id.* ¶ 266.  All of Old DuPont's assets and lines of business were divided into three parts: "Agricultural Business," Specialty Products Business," and "Materials Science Business."  *Id.*  The second is held by DuPont Specialty Products USA, LLC ("DuPont Specialty Products"), which was a direct subsidiary of Old DuPont.  *Id.* ¶¶ 71-72, 266.  DuPont Specialty Products is also a party to this litigation but not to this motion.  *See id.* ¶ 266.

On January 29, 2019, Old DuPont transferred the Tenant Space leasehold to DuPont Specialty Products.  *Id.* ¶ 71.  Later in the first half of 2019, New DuPont created two additional companies.  *Id.* ¶¶ 269, 276-77.  First, Corteva was created to hold Old DuPont's Agricultural Business and to serve as Old DuPont's corporate parent.  *Id.* ¶¶ 269, 277.  Second, New Dow was created to hold Old DuPont's Materials Science Business and to serve as Old Dow's corporate parent.  *Id.* ¶¶ 269, 276.  DuPont Specialty Products became a subsidiary of New DuPont on June 1, 2019.  *Id.* ¶ 72.  Further, Corteva and New DuPont each assumed portions of Old DuPont's PFAS liabilities.  *Id.* ¶ 273.  Plaintiffs again assert that the relevant details are obscured in confidential schedules to a separation agreement but assert that they may proceed directly against

---

[3] Plaintiffs clarify that this company would not have been "New DuPont" until the second half of 2019, instead being dubbed "DowDuPont."  *See* SAC ¶ 281.  For ease of reference, however, the Court refers to the entity throughout as "New DuPont."

those entities for Old DuPont's pollution at the four Sites.  *Id.* ¶ 275.  Corteva was spun off by New DuPont on June 1, 2019.  *Id.* ¶ 277.

### B. Procedural History

Plaintiffs filed the Chambers Works action in New Jersey Superior Court, and Defendants removed to this Court.  Civ. No. 19-14766 D.E. 1.  Plaintiffs filed the SAC on August 31, 2020.  Civ. No. 19-14766, D.E. 55.  Count III is an ISRA claim against Old and New DuPonts and Corteva.  *Id.* ¶¶ 337-56.  Plaintiffs claim that Old DuPont's transfers of the Tenant Space to DuPont Specialty Products on January 29, 2019, and of DuPont Specialty Products to New DuPont, were done without having obtained the permission of the New Jersey Department of Environmental Protection ("NJDEP" or "the Department") or filing a Remediation Certificate and establishing a Remediation Funding Source ("RFS").  Plaintiffs continue that the transfers triggered ISRA, and that Defendants remain uncompliant.  *Id.* ¶¶ 352-53.  Plaintiffs ask the Court to order Movants to comply with ISRA and its regulations and to reimburse the Commissioner of the NJDEP for the costs of enforcement.  *Id.* ¶ 356.  Movants have filed the instant motion, seeking to dismiss Plaintiffs' IRSA claim as it relates to the alleged ISRA triggers in 2019.  D.E. 174.

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to move to dismiss a count for "failure to state a claim upon which relief can be granted[.]"  To withstand a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although the plausibility standard "does not impose a probability requirement, it does require a

pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotations and citations omitted).

In evaluating the sufficiency of a complaint, district courts must separate the factual and legal elements. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009). A court "must accept all of the complaint's well-pleaded facts as true." *Id.* at 210. A court, however, does not credit labels, conclusions, and a formulaic recitation of the elements of a cause of action. *Twombly*, 550 U.S. at 555 (internal quotations omitted); *see also Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011). But even if plausibly pled, a complaint will not withstand a motion to dismiss if the facts alleged do not state "a legally cognizable cause of action." *Turner v. J.P. Morgan Chase & Co.*, No. 14-7148, 2015 WL 12826480, at *2 (D.N.J. Jan. 23, 2015).

## III.   ANALYSIS

Movants' motion raises several arguments, which the Court considers in turn.

### A.   Mootness

Movants first argue that Plaintiffs' ISRA claim is moot because Movants complied with the statute. M. Br. at 8. They state that DuPont Specialty Products filed the General Information Notice ("GIN") required by the statute as well as an RFS Guaranty, which established an RFS. *Id.*[4] Plaintiffs counter that the documents submitted by New DuPont, Old DuPont, and DuPont Specialty Products do not satisfy ISRA, that New DuPont's tangible net worth disqualifies it from submitting a self-guarantee, that the proffered surety bond was insufficient, and that no party

---

[4] In a footnote, Movants add that the Court should not award Plaintiffs the fees and costs they also seek for enforcing the ISRA claim. M. Br. at 9 n.8. The Court does not address this argument because it is not properly raised. *See Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) (ruling that a passing reference to an issue does not properly raise the issue to a court) (citations omitted).

properly requested a waiver from the NJDEP.  Opp'n at 21-22.  Plaintiffs also rely heavily on extraneous documents.  *See* D.E. 200-3 *through* -10.

Before reaching the merits, the Court must first determine whether it may consider certain of Movants' information in deciding this motion.  In a footnote, Movants assert that the Court can rely upon SEC filings that Plaintiffs cite in the SAC.  M. Br. at 5 n.5.  They also maintain—in another footnote—that the documents that they submitted to Plaintiffs to allegedly satisfy ISRA "underlie the ISRA claim because Plaintiffs explicitly stated they were not filed.  Thus, they may be considered now."  *Id.* at 7 n.7.  Plaintiffs agree that the Court can consider the SEC filings and do not appear to object to the use of the other documents.  *See* Opp'n at 3, 13 n.8.

Federal Rule of Civil Procedure 12(d) provides that, "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion *must* be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d) (emphasis added).  Given this mandatory language, the Court must determine whether the documents can be properly considered at this stage.

In deciding a motion to dismiss, a court ordinarily considers only the complaint's well-pled factual allegations, exhibits attached to the complaint, and matters of public record.  A court may also rely on "a document *integral to or explicitly relied* upon in the complaint."  *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) (emphasis in original) (citation omitted).  A document is integral if a "claim would not exist but-for the existence of the document."  *Dix v. Total Petrochemicals USA, Inc.*, No. 10-3196, 2011 WL 2474215, at *1 (D.N.J. June 20, 2011).  "[W]hat is critical is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  If a court considers material beyond the bounds

7

delineated by the Third Circuit, then the court must, as noted, convert a motion to dismiss to one for summary judgment. *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287-88 (3d Cir. 1999); *see also* Fed. R. Civ. P. 12(d).

In *Dix*, the court had to determine whether it could consider a document that the plaintiff had not cited in the complaint or attached to it but that the defendant relied on in its motion to dismiss. 2011 WL 2474215, at *1. The *Dix* court stated that the exception for "integral" documents applies only "when the claim would not exist but-for the existence of the document." *Id.* (collecting cases). Simply because a document is indispensable for an affirmative defense "or bear[s] on an essential element of the claim[]" is not enough. *Id.* In the court's words, "[s]uch a reading of the exception would swallow the rule, and transform the boundary between motions to dismiss and motions for summary judgment." *Id.* at *2. Rather, the court in *Dix* explained, the exception "is much more limited: such documents can be considered only if they are integral to the complaint, in order to prevent a complaint from misleadingly relying on only part of such documents." *Id.*

The Court finds *Dix* persuasive and follows it. The Court finds that the documents Movants submit to establish that they have mooted Plaintiffs' ISRA claim are not properly considered at the motion to dismiss stage. As noted, Movants maintain that the relevant documents are "integral" as the "documents underlie the ISRA claim because Plaintiffs explicitly stated they were not filed." M. Br. at 7 n.7. This argument misses the mark. As *Dix* explained, an external document may be considered only if the plaintiff's "claim would not exist but-for the existence of the document." *Dix*, 2011 WL 2474215, at *1. To be sure, Plaintiffs assert that Movants have failed to comply with ISRA insofar as they have not submitted a GIN or established an RFS. *E.g.*, SAC ¶ 352 ("By its actions initiating and completing the January 29, 2019 transfer of the leasehold to certain

8

portions of the Site associated with fluoroelastomer-related manufacturing operations to Specialty Products, without having obtained the Department's approval pursuant to N.J.A.C. Sections 7:26B-5.3 through 5.9 *or without having first filed a Remediation Certification and establishing an RFS*, Old DuPont violated ISRA and has continued to violate ISRA each day that it has failed to do so.") (emphasis added); *see also id.* ¶ 353 (making similar allegation regarding "the June 1, 2019 transfer of ownership of Specialty Products to New DuPont[.]").  But Plaintiffs' ISRA claim would still exist whether or not the documents exist.  Movants essentially contend that the documents defeat Plaintiffs' ISRA allegations.  In response, Plaintiffs' assert that the documents Movants submitted do not satisfy ISRA—that they have no legal effect whatsoever.  In other words, Plaintiffs' dispute with Movants is not over whether those documents exist, but over their effect.  Plaintiffs' claim may not ultimately be successful if the Court interprets the documents in the manner advocated by Movants, but for the reasons discussed above, the Court cannot engage in that inquiry at this stage.

Because the Court does not consider the documents that support Movants' arguments, and because the Court declines to convert the motion to one for summary judgment, the motion is denied as to mootness.[5]  Similarly, to the extent Movants ask the court to consider the documents in connection with their other arguments, the Court does not.

---

[5] The Court is also not convinced that mootness is the proper argument.  Mootness occurs when, after a case is filed with a live dispute, there is no longer a live controversy due to certain actions or events.  *Hartnett v. Pennsylvania State Educ. Ass'n*, 963 F.3d 301, 305-06 (3d Cir. 2020) (citations omitted).  Here, Movants appear to be arguing that a live controversy never existed in the first place because they never violated ISRA as alleged.

**B. Exceptions to ISRA**

Movants next argue that even if the ISRA claim is not moot, the 2019 reorganization of the defendant companies is exempt from ISRA.  M. Br. at 11.  According to Plaintiffs, two ISRA triggers occurred in 2019.  After Old DuPont transferred the Chambers Works Site to Chemours, FC, LLC, in January of 2015, Chemours FC leased the Tenant Space back to Old DuPont.  SAC ¶¶ 20, 68-70. Old DuPont then transferred the lease to the Tenant Space to DuPont Specialty Products on January 29, 2019—this transfer is the first alleged trigger.  *Id.* ¶ 71.  DuPont Specialty Products had been Old DuPont's direct subsidiary.  *See id.* ¶¶ 71-72, 266.  DuPont Specialty Products' direct relationship with Old DuPont was severed when DuPont Specialty Products became a subsidiary of New DuPont on June 1, 2019—this event is the second alleged trigger.  *Id.* ¶ 72.  Movants assert that the reorganization is sheltered by three different exceptions to ISRA. M. Br. at 12.  Movants refer to them as "(1) the corporate reorganization exclusion; (2) the common ownership exclusion; and (3) the indirect owner exclusion."  *Id.* (internal citations and parentheticals omitted).  Plaintiffs responds that no exception to ISRA applies.  Opp'n at 23.  The Court will first examine the statute and relevant regulations, and then consider the three exclusions in turn.

"New Jersey enacted ISRA, formerly the Environmental Cleanup Responsibility Act, in 1983 because New Jersey is home to many industrial sites and has been saddled with the cost of remediating many contaminated properties now abandoned."  *Carneys Point Twp. v. E.I. Du Pont De Nemours & Co.*, No. 1:17-cv-00264, 2017 WL 3189886, at *1 (D.N.J. July 26, 2017) (footnote omitted) (citing N.J. Stat. Ann. § 13:1K-7 (New Jersey Legislature's findings and declarations in ISRA)).  ISRA reaches not only the industrial site itself, but surrounding waterways and lands to which the contamination has spread.  *In re Adoption of N.J.A.C. 7:26B*, 608 A.2d 288, 291 (N.J.

1992) (discussing predecessor statute).  New Jersey courts construe ISRA broadly to effectuate its

remedial purpose.  *Cedar Knolls 2006, LLC v. N.J. Dep't of Envt. Prot.*, No. A-1405-15T3, 2017

WL 4158890, at *3 (N.J. Super. Ct. App. Div. Sept. 20, 2017).

The relevant statute provides in part as follows:

> The owner or operator of an industrial establishment planning to
> close operations or transfer ownership or operations shall notify
> the department in writing, no more than five days subsequent to closing
> operations or of its public release of its decision to close operations,
> whichever occurs first, or within five days after the execution of an
> agreement to transfer ownership or operations, as applicable.

N.J. Stat. Ann. § 13:1K-9(a).  As a result, liability under the statute attaches if a triggering event

occurs, generally when the allegedly polluting business is shut down or sold, and the owner or

operator of the site has not proactively complied with the statute.  *Pan Chem. Corp. v. Hawthorne*

*Borough*, 961 A.2d 1291, 1222 (N.J. Super. Ct. App. Div. 2009).  Broadly speaking, to comply

with the statute, the owner or operator of the industrial site must provide written notice to the

NJDEP, and if the owner or operator cannot independently remediate the site, then the owner must

establish an RFS.  N.J. Stat. Ann. § 13:1K-9(a); *Carneys Point*, 2017 WL 3189886, at *1.  One

court has compared an RFS to "a cookie jar[,]" as it consists of money set aside for the NJDEP to

remediate the site and/or reimburse municipalities if they bear the initial costs of remediation.

*Carneys Point*, 2017 WL 3189886, at *1 (internal quotation marks omitted).

The statute has exceptions.  N.J. Stat. Ann. § 13:1K-8 provides that eleven types of

transactions or occurrences that would presumptively trigger ISRA are not "changes in ownership"

within the meaning of the statute.  N.J. Stat. Ann. § 13:1K-8.  A New Jersey appellate court

explained that N.J. Stat. Ann. § 13:1K-8, particularly the passage addressing what is not considered

"a change of ownership, reflects the Legislature's concern that there be a basic continuity of

beneficial ownership between the entities, retention of the prior entity's liability by the resulting

11

entity, and preservation of the prior entity's available assets by the resulting entity to meet its remediation responsibilities."  *Cedar Knolls 2006*, 2017 WL 4158890, at *3.  The NJDEP's implementing regulations shed light on the legislation.  *See* N.J. Admin. Code § 7:26B-2.1.

Plaintiffs maintain that none of the exceptions to ISRA can apply to Movants' 2019 activities because "real property" cannot be considered an "asset" under ISRA.  Opp'n at 25.  Otherwise, they argue, allowing a real estate transfer to escape ISRA's reach would eviscerate the New Jersey Legislature's policy goals.  *Id.*  The Court disagrees.  NJDEP's regulations define "industrial establishment" as "any place of business *or real property* at which such business is conducted[.]"  N.J. Admin. Code § 7:26B-1.4 (emphasis added).  The regulation also provides the following in relevant part:

> For properties which are owner occupied or are leased to a single tenant, the industrial establishment includes all of the block(s) and lot(s) upon which the business is conducted and those contiguous block(s) and lot(s) controlled by the same owner or operator that are vacant land, or that are used in conjunction with such business.  For leased properties with two or more leased spaces, the industrial establishment includes the leasehold and any areas of concern that provide, are associated with, or are utilized for, hazardous substances and wastes to or from the leasehold, regardless of their location.

*Id.*  All the exclusions Movants invoke concern "industrial establishments."  Indeed, an unpublished state court decision explained that, in enacting N.J. Stat. Ann. § 13:1K-8, "the legislature went out of its way to specify certain real property transfers that are not subject to ISRA."  *Carneys Point Twp. v. E.I. DuPont de Nemours & Co.*, No. SLM-L-251-16, at 13 (N.J. Super. Ct. Ch. Div. Aug. 8, 2019) (transcript of oral decision) (attached to Plaintiff's Opposition at D.E. 200-5).  The Court concludes that real property transfers are not, as a matter of law, precluded from falling into one of ISRA's exceptions.  The Court proceeds to consider the exceptions invoked by Movants.

### 1.  The Corporate Reorganization Exclusion

Movants first invoke what they name "the corporate reorganization exclusion."  N.J. Stat. Ann. § 13:1K-8 provides that "'[c]hange in ownership' shall not include: . . . a corporate reorganization not substantially affecting the ownership of the industrial establishment[.]"  N.J. Stat. Ann. § 13:1K-8; *see also* N.J. Admin. Code § 7:26B-2.1(a)(1).  The regulations define "Corporate reorganization not substantially affecting ownership" as "the restructuring or reincorporation by the management or owners of an entity, which does not diminish the availability of assets for any remediation, diminish the Department's ability to reach those assets, or otherwise hinder the owner's or operator's ability to remediate the industrial establishment."  N.J. Admin. Code § 7:26B-1.4.  Neither the statute nor regulations define "restructuring" or "assets."

Movants represent that no reported decisions have construed this exclusion to ISRA in an analogous context.  M. Br. at 19.  Instead, Movants point to the NJDEP's publicly available guidance and correspondence between ConocoPhillips and the Commissioner of the NJDEP, seeking and receiving confirmation that the same ISRA exclusions invoked by Movants in this motion did not apply to a corporate restructuring that ConocoPhillips carried out in 2012; Movants have attached both to the motion.  *Id.* at 15-16 (citing D.E. 174-6 at 22-26, 31-110).

The guidance is publicly available at https://www.nj.gov/dep/srp/isra/isra_applicability.htm.  The Court may take judicial notice of this public record.  *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).  However, whether the Court may also take judicial notice of the NJDEP's letter decision is a closer call.  *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 988 F.2d 1192, 1197 (3d Cir. 1993).  But even if the Court can take notice of both sources, Movants present no authority explaining the legal effect of that

letter decision on non-parties (*i.e.*, Movants) to that matter.[6]   In passing, Movants describe the letter as "precedent[,]" but they present no authority for the proposition that the Court is bound by it.  M. Br. at 19.  Nor do they persuasively argue that the letter is even relevant, explaining only that under a since-withdrawn regulation, the NJDEP published "Letters of Non-Applicability" regarding certain transactions.  *Id.* at 3-4 & n.4.  The letter *may* be relevant if Movants relied on it in structuring the transactions at issue.  But even this *potential* relevance needs to be fleshed out factually in discovery.  Opp'n at 31.[7]

Similarly, Movants have not persuaded the Court that it is bound by the NJDEP guidance.  Movants say only that the guidance is a public explanation of ISRA's exclusions.  *See* M. Br. at 15.  Movants do not argue that the "guidance" is the product of notice-and-comment rulemaking required by state law for agencies promulgating binding rules, *see N.J. Dep't of Env't Prot. v. Radiation Data, Inc.*, No A-1777-17T3, 2018 WL 5728658, at **9-10 (N.J. Super. Ct. App. Div. Nov. 2, 2018), or that the Court must apply any of the deference doctrines in reading the guidance. Indeed, under New Jersey law, courts "do not automatically accept an agency's interpretation of a statute or a regulation, and [they] review strictly legal questions de novo."  *Id.* at *10.  Further, New Jersey's Administrative Procedure Act makes clear that even when an agency is empowered to issue guidance, such guidance may not "(1) impose any new or additional requirements that are

---

[6] Movants aver only that the Court can take notice of the letter.  M. Br. at 20 n.13 (citing *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 274 (D.N.J. 2007)).  In *Intelligroup*, the court took notice of a no-action letter issued by the SEC for the fact that no action was taken by that agency. 527 F. Supp. 2d 262, 274.  The court, however, stressed that it was not taking notice of the letter for the merits of its determination.  *See id.* at 274 n.2.

[7] To be clear, the Court is not making any finding as to relevance even if Movants did rely on the ConocoPhillips letter in structuring the relevant transactions.  Besides potential factual differences between ConocoPhillips' actions in 2012 and Movants' actions here, the potential legal relevance has to be ruled on, such as to the pertinent scienter requirement.

not included in the State or federal law or rule that the regulatory guidance document is intended to clarify or explain; or (2) be used by the State agency as a substitute for the State or federal law or rule for enforcement purposes."   N.J. Stat. Ann. § 52:14B-3a(c).   When agency guidance constitutes an improperly made rule, New Jersey courts have ruled the guidance invalid.   *E.g.*, *In re N.J.A.C. 7:1B-1.1 et seq.*, 67 A.3d 621, 641-46 (N.J. Super. Ct. App. Div. 2013).   Movants provide no authority showing that the guidance is binding authority.   As a result, the Court will not rely on it to the extent that Movants urge and will instead undertake its own interpretation of the statute and regulations.

The Court also declines to engage in the comparative analysis of Defendants' financial resources championed by the Movants and their invocation of the NJDEP guidance.   *See* M. Br. at 16.   In addition, Movants emphasize that "DuPont Specialty Products[] has more assets available for remediation of the site than [Old DuPont] did."   *Id.* at 17.   Movants cite to the SAC in support, but the cited paragraphs do not mention DuPont Specialty Products.   *See* SAC ¶¶ 219, 222, 289. Indeed, as Plaintiffs point out, DuPont Specialty Products has not disclosed its assets.   Opp'n at 29.   Even were the Court to consider the letter in the ConocoPhillips matter, the Court cannot assess how persuasive or analogous the Commissioner's determination in that matter is to this case without an accurate picture of DuPont Specialty Products' finances.

The Court also agrees with Plaintiffs that it is the assets of DuPont Specialty Products that are key under N.J. Admin. Code § 7:26B-1.4, not New DuPont's.   The regulation speaks in terms of "the owner's or operator's ability to remediate the industrial establishment."   N.J. Admin. Code § 7:26B-1.4.   Plaintiffs have alleged that Chemours FC owns the Chambers Works Site, and that DuPont Specialty Products currently holds the lease for the Tenant Space.   SAC ¶¶ 69-71.   Those entities would more naturally be described as the Tenant Space's "owner or operator" than New

DuPont would be.  N.J. Admin. Code § 7:26B-1.4 defines "direct owner" as "any person that directly owns or operates an industrial establishment."  The SAC alleges that DuPont Specialty Products leased, operated, and controlled the site in question.  SAC ¶ 361.  As a result, DuPont Specialty Products would be considered the "direct owner."  In comparison, N.J. Stat. Ann. § 13:1K-8 defines "indirect owner" as "any person who holds a controlling interest in a direct owner or operator, holds a controlling interest in another indirect owner, or holds an interest in a partnership which is an indirect owner or a direct owner or operator, of an industrial establishment[.]".  New DuPont is alleged to DuPont Specialty Products' corporate parent, and thus would appear to be an indirect owner.

The Court denies Movants' motion on this basis.

### 2.  The Common Ownership Exclusion

Movants next invoke what they label the "common ownership exclusion."  N.J. Admin. Code § 7:26B-2.1(a)(2) provides as follows:

> The following transactions shall not be considered closing operations or transferring of operations or ownership: [a] transaction or series of transactions involving the transfer of stock and/or assets among corporations under common ownership if the transaction or transactions will not result in: the diminution of the net worth of the corporation that directly owns or operates the industrial establishment by more than 10 percent; or a greater or equal amount of assets are available for the remediation of the industrial establishment before and after the transaction or transactions[.]

N.J. Admin. Code § 7:26B-2.1(a)(2)(i)-(ii).  Movants represent that their arguments regarding this exclusion are substantively similar to those made in support of the corporate reorganization exclusion.  M. Br. at 23.  Again, however, Movants rely on allegations in the SAC that do not appear to speak to the issue, *see id.* (citing SAC ¶¶ 195, 213), documents that the Court does not

consider, and financial information that is not disclosed.  As a result, the Court cannot find, at this stage, that this exclusion applies.

### 3. The Indirect Owner Exclusion

Movants next invoke what they call the "indirect owner exclusion."  N.J. Admin. Code § 7:26B-2.1(a)(4) excludes from ISRA,

> [a] transaction or series of transactions involving the transfer of stock and/or assets resulting in a change in the person holding the controlling interest of an indirect owner of an industrial establishment, when the indirect owner's assets would have been unavailable for remediation if the transaction or transactions had not occurred[.]

N.J. Admin. Code § 7:26B-1.4 defines "indirect owner" is the same terms as the statute, as cited above.  *Compare* N.J. Admin. Code § 7:26B-1.4, *with* N.J. Stat. Ann. § 13:1K-8.

Movants again point the Court to the NJDEP's online guidance.  M. Br. at 24.  Again, the Court is not persuaded to accord the guidance the force of law in resolving the motion.  Movants next aver that New DuPont and that corporation's shareholders indirectly owned the leasehold at the Chambers Works Site before the 2019 transactions and afterwards.  *Id.* at 25.  Again, the Court declines to engage in the analysis proffered by Movants at the motion to dismiss stage.  And, as Movants acknowledge, the SAC alleges that the merger between Old DuPont and Old Dow was carried out in such a way that New DuPont did not assume Old DuPont's liability.  *Id*.  As a result, and as alleged, the assets of New DuPont have never been available to remediate the Chambers Works Site.

Plaintiffs argue that Old DuPont's transfer of the lease of the Tenant Space to DuPont Specialty Products in January 2019 was not a "transfer of stock and/or assets resulting in a change in the person holding the controlling interest of an indirect owner of an Industrial Establishment[,]" but a transfer by the direct owners of the leasehold.  Opp'n at 33-34 (quoting N.J. Admin. Code §

17

7:26B-2.1(a)(3)).  The Court agrees.  This transfer did not result "in a change in the person holding the controlling interest of an indirect owner[.]"  N.J. Admin. Code § 7:26B-2.1(a)(3).  At the time, DuPont Specialty Products was a subsidiary of Old DuPont, which, in turn, was owned by New DuPont.  None of that changed because of the transfer of the lease.  As a result, the indirect owner exclusion does not apply to the January 2019 transfer.

Plaintiffs make a similar argument regarding Old DuPont's transfer in June 2019 of DuPont Specialty Products to New DuPont from Old DuPont.  Opp'n at 34.  They explain that both before and after the transfer of DuPont Specialty Products, New DuPont remained an indirect owner of the Tenant Space—although less removed from DuPont Specialty Products—and that New DuPont's ownership did not change.  *Id.*  The Court again agrees.  At some point after December 2015 and before January 2019, Old DuPont became a subsidiary of New DuPont.  *See* SAC ¶¶ 260-61.  The SAC does not appear to precisely indicate when DuPont Specialty Products was organized, but it is clear that the company came into being after the formation of New DuPont and after Old DuPont became New DuPont's subsidiary.  *See id.* ¶¶ 71, 264, 266, 269.  Old DuPont transferred direct control of DuPont Specialty Products to New DuPont on June 1, 2019.  *Id.* ¶ 71.  As a result, New DuPont was the indirect owner of DuPont Specialty Product throughout.

As noted, the initial part of the inquiry focuses on a change in the controlling interest of an indirect owner.  *See* N.J. Admin. Code § 7:26B-2.1(a)(3).  The SAC does not allege that New DuPont's ownership underwent such a change.[8]  Although any indirect stake that Old DuPont would have held in the Tenant Space because of its direct corporate parenthood of DuPont Specialty Products was terminated when DuPont Specialty Products became a direct subsidiary of

---

[8] To the extent that Movants refer to New DuPont's shareholders, the Court agrees with Plaintiffs that such a wide-ranging factual inquiry is inappropriate at this stage.  Opp'n at 35.

New DuPont, the SAC does not detail whether the transaction(s) that accomplished this separation were transfers of "stock and/or assets."  Further, at this stage of the litigation, the Court has not yet determined whether Old DuPont was able to shed itself of liability for its PFAS pollution such that its "assets would have been unavailable for remediation if the transaction or transactions had not occurred[.]"  N.J. Admin. Code § 7:26B-2.1(a)(3).  Plaintiffs allege in the SAC that the spinoff of Chemours and other mergers and restructurings engaged in by Defendants are actual or constructively fraudulent transfers under Delaware and New Jersey law that are voidable.  SAC ¶¶ 466-85 (citing Del. Code Ann. tit. 6 §§ 1301-1312; N.J. Stat. Ann. §§ 25:2-20 to -34).  Old DuPont's assets, then, may remain available for the NJDEP to use to remediate the Tenant Space. But the Court cannot find, as a matter of law before discovery is complete, that Old DuPont's assets underwent a qualifying change.  Accordingly, this exclusion to ISRA does not apply.

### C. Failure to State a Claim

Finally, Movants argue that Plaintiffs have insufficiently pled that New DuPont and Corteva assumed Old DuPont's ISRA liability.  M. Br. at 26-27.  Plaintiffs note that Corteva and New DuPont have made a similar argument in a previous motion.  Opp'n at 36 (discussing D.E. 88 at 8-10).  The Court denied the motion as to that argument, reasoning that the limited jurisdictional discovery into the confidential schedules to Defendants' contracts "may also shed light on" that issue.  Opp'n at 36 (discussing D.E. 197 at 16).

The Court follows its prior reasoning.  As Plaintiffs point out, the Court has already issued an order permitting jurisdictional discovery into whether New DuPont and Corteva are linked to the other Defendants' making or selling of the chemical products that are at the heart of Plaintiffs' claims.  See D.E. 197 at 16.

Movants' motion is denied on this ground.

19

## IV.    CONCLUSION

For the foregoing reasons, Movants' motion, D.E. 174, is denied.  An appropriate Order accompanies this Opinion.

Dated: August 26, 2022

_____
John Michael Vazquez, U.S.D.J.

20